THE STATE v. GORDON ASHCRAFT, Appellant.—116 S. W. (2d) 128.

Division Two, May 3, 1938.

*Everett Frieze* for appellant.

*Roy McKittrick,* Attorney General, and *W. J. Burke,* Assistant Attorney General, for respondent.

ELLISON, J.—The appellant was convicted of burglary for breaking into the granary of Lorenzo Davis, a farmer in Polk County, and his punishment assessed by the jury at two years' imprisonment in the penitentiary. The evidence was circumstantial. His brief on this appeal contains six assignments of error, five of which complain in one way or another of the insufficiency of the evidence and one of the failure to grant him a new trial on the ground of surprise.

The prosecuting witness, Davis, lived about six miles south of Bolivar. He testified that on the evening of Monday, December 28, 1936, he fastened the door of the granary by means of a wire latch hooked over a nail. Early the next morning he found the door open, the place in disorder, different kinds of seeds and feeds dumped on the floor, a number of burlap sacks gone, and from twenty to thirty bushels of wheat missing. The wheat had some straw, chaff, pieces of sticks and the like mixed in it.

Along a course from the granary to the highway Mr. Davis found two sets of foot prints, one larger than the other. The larger set showed imprints of three chain outlines which had been stamped by the manufacturer across the sole of the shoe that made them. This shoe was larger than a number 8. There was a thin trail of wheat scattered along the course, and at a point toward the road he found seven sacks of wheat abandoned. He had got up that night about 1:30 and lit the lamp for a few minutes. It was his theory that this caused the burglars to leave the sacks of wheat thus found. At a wire fence which had been cut in effecting an exit to the highway he found a brown glove. The appellant's shoes were produced at the trial bearing the chain impressions above described and Mr. Davis said to the best of his knowledge "they compared with the shoe tracks left in the ground." He also identified the glove, but it was too small for his hand though all the footprints were more than a size

larger than his feet. The appellant was not asked to try on the glove by the attorneys on either side. It was proven by one witness that he owned a pair of brown gloves, but the witness could not say whether they were like the one in evidence.

Out on the highway the tire tracks of two automobiles were found in the ground, which was spongy from recent rainy weather. These cars had come from the east to a gateway into the barn lot of Floyd Russell, who lived about one-fourth mile east of Davis. Here they had headed in toward the gate and backed out swinging west, and continued backing until they were about one-eighth mile from the granary. The footprints from Davis' granary led to this point and loose wheat was scattered in the road. One set of tire tracks was smaller than the other, and such as would be made by a Model T. Ford. The left front tire had a knobby tread. It made the south track while the car was heading west and the north track after the car was backing west. The other car made larger tracks the right front tire leaving a peculiar marking.

Some two weeks later Sheriff Harry Butler examined the appellant's automobile, a Model T Ford coupe, and found a tire with a knobby tread on the left front wheel. There were two empty burlap sacks in the car, one with mud on it in the "turtle back" at the rear of the car, and the other under the front seat. Wheat was scattered all over the car, under the front seat, under the floor mat, and in the turtle back. The sack under the front seat was wet and some of the wheat thereunder was sprouting. Floyd Russell, Davis' neighbor, examined the Chevrolet sedan belonging to a young man named Homer Wilson. It had a tire on the right front wheel which "compared" with one of the broader tracks he had seen in the road made by the corresponding wheel of one of the two cars that had hauled off the wheat. Mr. Russell corroborated Davis in his testimony as to the physical conditions on the Davis place the morning after the burglary, except that he did not see the brown glove.

This evidence indicating two cars had transported the wheat, was circumstantially corroborated by Mr. and Mrs. Rotrammel, two other neighbors of Davis who lived on the road one-half mile east of him. About midnight (they heard the clock strike) of December 28, they were awakened by the noise of two automobiles passing their house. Very few cars traveled over that road and there was a hill just east of them which made automobiles labor in the soft ground. The moon was shining. They saw two cars traveling west toward the Davis place, one a Model T Ford and one a "gearshift" car. The latter was ahead but they were close together. These witnsses could not see how many persons were in the cars or who they were.

The next link in the chain of circumstantial evidence was this. Leo-

tus Griffen, a friend of the appellant, testified he met the appellant on December 28, the day of the burglary, about 7 o'clock P. M., in Don's Cafe at Bolivar, and rode with him in his car out into the country toward the Davis neighborhood. As they passed another automobile its horn was sounded. The appellant said it was Homer Wilson, that he wanted to talk to him, and turned around and followed the other car back to town. There he let Griffen out and parked his car beside Wilson's car and got out and talked to Wilson. This was about 8 P. M. or later, and the witness saw appellant and Wilson no more that night. He proceeded to Don's Cafe and remained there until about 10:30 or 11 o'clock. Homer Wilson was the owner of the Chevrolet sedan with a tire on the right front wheel which Mr. Russell testified "compared" with the peculiar tire track found in the road near the Davis place the morning after the burglary.

Next morning, December 29, about 11 A. M. Mrs. Carrie Mitchell was seated in a parked automobile on the south side of West Commercial Street in Springfield in the vicinity of the Greene County Farmers Exchange, located at No. 335 on that street. Mrs. Mitchell lived in the country east of Bolivar and was well acquainted with the appellant and Homer Wilson. She testified she saw the appellant drive by alone in an automobile going east and about the same time Homer Wilson passed driving alone in a car going west.

The same morning Mr. L. R. Crane, of the Greene County Farmers Exchange in Springfield, bought 854 pounds, or 14.2 bushels, of wheat from two men for $19.07. The wheat was poor grade and trashy, and sacked in burlap sacks. This was in the neighborhood of 10 o'clock—before noon, anyhow. The men had come in one car. They were middle aged—at least not old. The witness was unable to describe their appearance, clothing or height, or the kind of car they came in. He could not identify the appellant and Homer Wilson as being the two men, and would not say whether they were or not. He accounted for his poor memory by saying he bought a great deal of grain in just that way. A check for the wheat was issued by Miss Hodge, the bookkeeper.

Miss Hodge testified concerning the issuance of the check. She said two "boys" came to her window and asked for it. They requested that it be made payable to "Don Clark." She estimated they were from eighteen to twenty-two years of age and said there was a difference in their height. At first she said she could not positively identify the defendant as one of the boys and then in answer to a leading question stated she could not identify them. A photostatic copy of the check and indorsement was introduced in evidence and is in the bill of exceptions. It bears only the indorsement of the payee, Don Clark, and was paid by the bank on which it was drawn on December 30, the day after its issuance. The sheriff and prose-

cutor had Homer Wilson write the name Don Clark on two pieces of paper. These two specimens of Wilson's handwriting were introduced in evidence. F. W. Griffin, a deputy sheriff at the time of the trial, but for a period of fifteen years up to about eleven years before the trial engaged in the banking business and charged with the duty of passing on the authenticity of thousands of signatures, qualified as an expert witness. He gave it as his opinion that the indorsement on the check was written by the same hand as were the specimens, especially one of them. In our own inexpert opinion there is a marked similarity between them.

Sometime after December 28, the date of the burglary, appellant told his friend Murrell Jones "I made a good haul," but did not say what or when. On one occasion he also said, speaking of his Ford coupe, "I could put ten sacks of wheat in it."

The appellant was arrested on January 12, 1937, fifteen days after the burglary and was confined in jail for several days before he was admitted to bail. He was nineteen years old and had followed the crew that threashed the wheat involved on the Davis farm. He told the sheriff no wheat had ever been hauled in his car, and accounted for his whereabouts on the evening of December 28, the night of the burglary, first by saying he was at home (he lived at a cabin in Hutcheson's Cabin Camp) with a bunch of girls and boys listening to the radio and playing games until about midnight; and that after the company had left he remained there that night. Later that day, at the jail, he declared positively that he met Murrell Jones on the night of December 28 at Don's Cafe about 8 or 8:30 o'clock and went to the picture show for which the admission charge was 26 cents. Two hours later after the picture show was over they returned to Don's Cafe and remained there until about midnight, he playing the guitar in the back of the restaurant. The sheriff asked him what picture he saw at the show and he could not tell. Then the sheriff inquired if he had ever seen The Great Ziegfield show and he said no. That was the picture shown at the theater that night and the admission charge was 35 cents.

When arrested the appellant was wearing a pair of recently bought shoes with chain impressions across the soles and stated he had purchased them on the Saturday or Monday after Christmas. Monday was December 28, the date of the burglary. He declared to the sheriff he had bought the shoes because he was going to begin work on a WPA highway job the next day, December 29. He stated he was around town in Bolivar on December 29 but never did explain where. When appellant made these statements to the sheriff he had already been informed he was summoned for investigation about the Davis burglary and knew that fact when he was giving his answer.

On direct examination the appellant admitted he might have told

the sheriff the conflicting stories testified to by the latter concerning his whereabouts on Monday night, December 28; but he said he had been thinking the matter over since and had the facts straightened out as follows. Instead of going to the picture show that night with Murrell Jones it was on Saturday night, December 26, he went to the picture show, and he went with his girl friend Opal Spitz (Murrell Jones testified *he* went to the picture show Saturday night with appellant). And instead of entertaining some boys and girls at his cabin that Monday night, it was Sunday night that they were there, after he had been at his mother's in Springfield that day.

Accounting for his movements Monday evening (the night of the burglary) the appellant said Grover Spitz drove to his cabin about 7 o'clock and took him to Bolivar in Spitz's car. They rode around town and finally went to Don's Cafe about 9 P. M., where he remained until midnight. Spitz then drove him back to his cabin and slept until the next morning. He did not have his car out that night. The appellant was corroborated in this by Grover Spitz, but Spitz admitted that when the sheriff asked him in a group with others if they knew where appellant was that Monday night he did not answer. Spitz's father corroborated him to the extent of testifying that the son got home that night about 12:15 A M. Mr. and Mrs. Mac Findley testified they were at the Don Cafe on the night in question until 11 P. M., and that appellant was there that evening. The appellant denied the testimony of the witness Leotus Griffen that he had taken Griffen for a ride in the country that evening, passed Homer Wilson, and returned to Bolivar and had a conversation with Wilson. It seems a similar burglary charge was pending against Wilson and he did not testify in this case. But his father and mother, Mr. and Mrs. Albert Wilson, swore he was at home that night, and that his car was out of commission in the garage.

Combatting the testimony of Mrs. Mitchell that she saw appellant and Homer Wilson in Springfield the next morning, where, according to the State's theory, the two boys sold the stolen wheat, appellant's story was as follows. He spent the morning of Tuesday, December 29, at the home of Murrell Jones working on his car. Murrell was painting the barn. On the noon mail he received a card from the WPA office, dated December 22, 1936, notifying him to report for work December 24, the work to begin December 28. The card was introduced in evidence. He actually did begin work the next day, December 30. In anticipation of that, upon receipt of the notification card he purchased the work shoes which figure so prominently in the case from the store of Braithwaite & Company, in Bolivar about 1 P. M. This testimony not only tended to establish an alibi, as against the claim that appellant was in Springfield that

morning, but also showed he did not buy the work shoes that were supposed to have made the tracks from Davis' granary until *after* the burglary.

■ Having purchased the shoes he went back to his cabin and Grover Spitz, his sister Opal Spitz who was appellant's girl friend, Lula Frieze and Murrell Jones followed shortly thereafter arriving at the cabin about 1:30 P. M. That evening he went first to the home of Albert Wilson and then to the home of Harold Wakefield out in the country, to engage a room closer to his road work. He obtained one at the latter place. That night he gave up his cabin at Hutcheson's Cabin Camp and moved to the Wakefield home. This story of appellant was corroborated by the testimony of Grover Spitz, Opal Spitz, Lula Frieze and Murrell Jones. Grover Spitz fixed the time of their arrival at appellant's cabin at about 2 o'clock. Opal Spitz said they got there a little after 3 o'clock and remained until about 4:30. Murrell Jones thought they made the trip a little after 4 o'clock. We take judicial notice of the fact that Bolivar is only 28 miles from Springfield on State Highway 13, and that a person traveling at ordinary speed by automobile could have been in Springfield at 11 o'clock in the morning and in Bolivar in the afternoon by 4, 3 or even 2 o'clock. Jones recalled that appellant was at his home one morning fixing his car while he (Jones) was painting the barn, but would not say it was on December 29.

Two of these four witnesses said the appellant unwrapped a pair of new shoes from a package at the cabin and stated he had just bought them preparatory to going to work the next day. The other two witnesses saw the new shoes. Mr. W. M. Hines, a clerk in the Braithwaite store in Bolivar remembered selling the appellant a pair of work shoes sometime after Christmas but could not recall the date. The appellant told him he was buying the shoes because he was going to work on the road but could not remember whether appellant said he was going to start to work the *next* day. It was the State's theory that appellant received the WPA notice in the mail several days before December 28, and that he bought the shoes on Saturday, December 26, or Monday, December 28, preparatory to doing the road work *before* the burglary; and on cross-examination he would not deny that he so informed the prosecutor after his arrest. He stated on the witness stand, ''I was a little bit hazy when I was talking.''

Mr. Wakefield corroborated appellant's story about renting a room at his home the evening of December 29. Mrs. Lizzie Looney, caretaker at Hutcheson's Cabin Camp, agreed that appellant surrendered his cabin the night of December 29 but denied that he and his four guests above mentioned were there that afternoon. Appellant ex-

plicitly denied that he burglarized Davis' granary or stole his wheat; that he drove his car over the road past the Rotrammel home that night; that he was with Homer Wilson; that he was in Springfield the next morning; and that he had anything to do with selling any wheat to the Farmers Exchange. He also proved by two witnesses that wheat had been hauled in his car in October and November before the robbery but both times it was carried in the back of the car.

Mr. and Mrs. Albert Wilson, parents of Homer Wilson, appellant's alleged accomplice and indorser of the wheat check issued by the Farmers Exchange, testified their son was at home all day Tuesday, December 29, except two or three hours in the afternoon.

■ We have reviewed the evidence at length—perhaps too fully. In our opinion the State made a case for the jury. The appellant objects that the case was made by piling inference on inference, viz.: That the footprints leading from the Davis granary were made by appellant's feet; that the tire tracks were made by appellant's and Homer Wilson's automobiles; that the cars transported the wheat; that there was a conspiracy between the appellant and Wilson to burglarize the granary and steal and sell the wheat; that they were together in Springfield the next morning for the purpose of selling the wheat, although no one saw them together; that Wilson in the consummation of the conspiracy received and cashed the check for the wheat; that the wheat sold was the same wheat that had been stolen from the Davis granary, etc.

There are a number of cases in this State forbidding the piling of inferences: Strother v. C., B. & Q. Railroad Co. (Mo. Div. 2), 188 S. W. 1102, 1105; Phillips v. Travelers Ins. Co., 288 Mo. 175, 185, 231 S. W. 947, 949; State ex rel. v. Cox, 298 Mo. 427, 435, 250 S. W. 551, 553; Layton v. Chinberg (Mo. Div. 2), 282 S. W. 434, 436; State v. Capps, 311 Mo. 683, 698, 278 S. W. 695, 699; State ex rel. City of Macon v. Trimble et al., 321 Mo. 671, 12 S. W. (2d) 727, 731 et seq.; so, too, in many other jurisdictions; 14 Ency. Evid., p. 100, note. But the doctrine is vigorously assaulted by Dean Wigmore in his treatise on Evidence (2 Ed.), Vol. 1, section 41, page 258, where he says:

"It was once suggested that an 'inference upon an inference' will not be permitted, i. e., that a fact desired to be used circumstantially must itself be established by testimonial evidence; and this suggestion has been repeated by a few Courts, and sometimes actually enforced. There is no such rule; nor can be. If there were, hardly a single trial could be adequately prosecuted." [See, also, Best on Presumptions of Law and Fact, sec. 187; Burrell's Circumstantial Evidence, p. 138.]

It is true that a number of inferences must be drawn in this case converging on the conclusion of guilt. But each is supported by a

separate factual foundation. If it be admitted that the ultimate conclusion of guilt is itself an inference piled upon underlying separate inferences then there hardly could be a conviction in any circumstantial evidence case. Neither can it be conceded that the proven facts are not inconsistent with the theory of appellant's innocence. He conceded its damaging effect by attempting to overcome it, as, for instance, by establishing an alibi. We shall not extend the opinion by discussing the evidence in detail. In our opinion the issues of fact upon the two sides presented questions for the jury, and the jury has decided them. We cannot interfere.

Appellant maintains it was error to admit the evidence tending to connect Homer Wilson with the case. This contention is made on the theory that there was no substantial evidence showing a conspiracy existed between the appellant and Wilson. We think there was. There is evidence justifying the inference that they acted together in burglarizing the granary and in transporting and selling the wheat.

Another assignment is that the State did not prove a sufficient breaking into the granary to constitute burglary. This contention is without legal foundation. The granary door was fastened by means of a wire latch hooked over or wrapped around a nail. The removal of this was sufficient to make the crime burglary. [4 R. C. L., sec. 3, p. 416; 9 C. J., sec. 6, p. 1010; State v. Helms, 179 Mo. 280, 285, 78 S. W. 592, 594; State v. Woods, 137 Mo. 6, 10, 38 S. W. 722, 723.]

The last assignment complains of error in the court's refusal to grant appellant a new trial on the ground of surprise and in order to permit him to avail himself of newly discovered evidence. This assignment is based on the thirteenth ground in the verified motion for new trial which was as follows:

"That the evidence as to the date on the work card of the defendant came as a surprise to the defendant, that as the evidence stood the defendant was impeached by written evidence unexplained, that since the trial the defendant has investigated and finds that there are five copies of his card on file with the relief officials and that each of the cards shows December 30th and not December 28th as on the card put in evidence and that in addition the work sheet kept by the relief officials shows the date to be December 30th, all of which facts fully appear in the affidavit attached hereto, which evidence the defendant can produce at a new trial."

The State filed a counter affidavit signed by Verle Ryan, WPA foreman of the road project on which the appellant worked. This affidavit stated that appellant did report for work on the morning of December 28, 1936, pursuant to the notice sent him, this being the notice which the appellant testified he did not receive until Tuesday

618

noon, December 29, 1936. The affidavit further recites that later on December 28 the appellant asked permission to defer the commencement of his work until December 30 and for that reason the five copies of his work card on file in the relief office were made to show he began work on December 30.

Without going into these disputed facts, we think the appellant was not entitled to a new trial on the ground of surprise. He says the evidence as to the date December 28 on his work card came as a surprise to him but it was *his* work card, produced by him from papers in his pocket while on the stand. If he did not know its contents it was his own fault. He did not claim surprise at the time the work card was introduced in evidence.

This disposes of all the points made in appellant's brief. Finding no error in the record the judgment is affirmed. All concur.