STATE of Missouri,
Plaintiff-Respondent,

v.

Malcolm ALDRICH,
Defendant-Appellant.

No. 51168.

Missouri Court of Appeals,
Eastern District,
Division Two.

Jan. 13, 1987.

Motion for Rehearing and/or Transfer
Denied Feb. 11, 1987.

Application to Transfer Denied
March 17, 1987.

Thomas F. Flynn, St. Louis, for defendant-appellant.

William L. Webster, Atty. Gen., Elizabeth A. Levin, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

REINHARD, Judge.

Defendant appeals after his jury conviction on two counts of passing bad checks, § 570.120, RSMo 1986. He was found by the court to be a prior and persistent offender and sentenced to two consecutive terms of five years' imprisonment. We affirm.

Defendant was convicted for passing bad checks written on two checking accounts, the Central West End Group account at Mercantile Trust Company in St. Louis, and the New City Investment account at Woods Mill-Forty Bank in Chesterfield, Missouri. Defendant challenges the sufficiency of the evidence on both counts. We recite as briefly as possible the state's evidence and that of the defendant which support the conviction.

Defendant was a one-third partner along with Alexander Zavradinos (Alex) and Dimitrious Zavradinos in the Central West End Group. The partnership, which managed rental properties for others, maintained its office at 4535 Lindell Boulevard in St. Louis. Defendant was the partnership's bookkeeper and was involved in the day-to-day management of the properties including daily paying of bills and, on occasion, represented himself as an agent of the partnership. He testified he was at the partnership office daily and that Alex also was there every day. Defendant and Alex resided in the same house.

On February 7, 1984, Alex opened the Central West End Group account at Mercantile with an initial deposit of $765.50. Although Alex was the only person authorized to sign checks on the account, defendant testified that he was "not ignorant ... at all" about the partnership's checking account and that he would sometimes sign checks on the account for Alex pursuant to Alex's authorization even though only Alex had signed the signature card at the bank. He stated, however, that Alex was responsible for the Central West End Group checking account.

On March 12, 1984, Mercantile mailed the first of many overdraft notices to Central West End Group at their address of record, 4535 Lindell Boulevard. This notice indicated that a check in the amount of $6,500.00, written on the Central West End Group account, had been dishonored because of insufficient funds in the account. Had the check been paid on that date, the account would have been overdrawn $4,660.25. A second overdraft notice, indicating presentment and return of the $6,500.00 check, was sent to Central West End Group on March 16. Had the check been honored on March 16, the account would have been overdrawn by $5,109.53. Beginning March 21, 1984, overdraft notices on 41 other checks were sent to Central West End Group at the Lindell Boulevard address on six separate days in March and on eight days in April. Although de-

fendant denies seeing the overdraft notices dated March 12, 16, 21, and 22, he admits being at the 4535 Lindell address daily, that mail was received every day, and that he saw "lots of overdraft notices." Also on March 21, the account went into overdraft status because a $6,500.00 check written by defendant on the New City Investment account and payable to Central West End Group was returned unpaid to Mercantile.[1] The negative balance was $1,244.00. From that date on, the account remained in overdraft status, even though a few subsequent deposits were made and checks continued to be presented for payment.

In early March 1984, defendant ordered goods for the New Star Market from Joseph Singler, district manager for Mass Merchandisers, Inc. Defendant indicated to Singler that he was the owner of the New Star Market. Defendant agreed to pay for the merchandise upon receipt of the goods. Singler personally delivered the goods on Thursday, March 15, 1984. Defendant did not pay for the goods upon delivery as he had previously agreed with Singler, explaining that the office paid bills only on Fridays. Singler stopped at New Star Market three times on Friday, March 16; at 4:30 p.m. defendant gave him a check in the amount of $2,698.42, payable to Mass Merchandisers and written on the Central West End Group account at Mercantile. Singler said Alex was in the store when he picked up the check. The check was dated March 17, 1984, and bore signatures for Alex and defendant. Defendant testified he was authorized by Alex to write the check and to sign Alex's name above his own signature. Singler forwarded the check to his company's home office in Harrison, Arkansas. The check was presented for payment on March 27 and on a later date and was dishonored each time because of insufficient funds in the account. The check has never been paid and the company has not been paid for the merchandise.

After the Central West End Group account went into overdraft status on March 21, 1984, the bank paid two checks, in the amounts of $5,158.63 and $4,407.50, which bank officer Craig Fowler testified he authorized pursuant to an agreement with Alex or defendant. An additional eight checks, all in amounts of $500.00 or less, were also paid by Mercantile after March 21.

On April 16, a "hold" was placed on the account and the overdraft balance of $6,736.74 was reported to the city circuit attorney. On May 9, 1984, the circuit attorney's office sent separate "10–day letters" to Alex and defendant at their common address concerning the check to Mass Merchandisers, Inc. The letter stated that the check to Mass Merchandisers had been dishonored due to insufficient funds and that the circuit attorney would initiate a felony prosecution under RSMo 570.120 within 10 days of the mailing of the letter if the amount of the check was not paid to Mass Merchandisers. The check was never paid. Defendant admits receiving a copy of the 10–day letter and said he discussed it with Alex.

Defendant also was president of B.A.C. Investment d/b/a New City Investment. He testified B.A.C. went into bankruptcy in 1981 and defendant, as statutory trustee, was appointed receiver. Along with a Dr. Clark, he handled "all of the financial affairs of the corporation" from 1981 to 1983. In 1984 defendant was instructed by the bankruptcy court to "put together all financial information I had available to me...."

The New City Investment account was opened in January 1980 by defendant's wife who was listed as the only person authorized to sign checks on the account. Defendant's name appeared on a second signature card as "husband" but he was not authorized to sign checks. In October 1980, the New City Investment checking account was closed by a debit memo which reduced the balance from $85.26 to zero. The debit memo was entered as a result of a garnishment on the account. The ac-

---

1. This check should not be confused with the dishonored $6,500.00 check written on the Cen-
tral West End Group account.

count was closed throughout 1982, 1983, and 1984, and no deposits were made into the account during those years.

Defendant wrote a $6,500.00 check dated March 14, 1984, on the New City Investment account payable to the Central West End Group. The check was deposited at Mercantile, and $6,500.00 was credited to the partnership account on Monday, March 19. On March 20, the check was presented for payment to Woods Mill-Forty Bank and was promptly dishonored and returned to Mercantile. The Central West End Group account at Mercantile was debited $6,500.00 on March 21. This debit created the overdraft balance in the account at Mercantile. Defendant said he did not know the New City Investments account was closed. He said he had not looked at the status of the account for six or seven months prior to writing the check and he thought there was at one time at least $9,000.00 in the account. He said he had written many other checks on the account.

Defendant was tried alone under an information that charged that he, acting with Alex, with intent to defraud, passed the Central West End Group insufficient funds check to Mass Merchandisers and the New City Investment closed account check to Mercantile.

At trial, defendant testified that he had pleaded guilty in October 1978 to five counts of felony stealing and was placed on probation for five years. The state presented as exhibits certified copies of the indictments, judgments, and sentences related to defendant's prior felony stealing offenses. The exhibits indicate defendant was represented by counsel at the time he entered his guilty pleas.

Defendant now challenges the sufficiency of the evidence to convict him of the two counts of passing bad checks. In determining whether there was sufficient evidence, we accept as true all evidence, circumstantial or direct, tending to prove defendant guilty together with all reasonable inferences which support the verdict. We must determine whether there was sufficient evidence from which reasonable persons could have found defendant guilty as charged. *State v. Dunavant,* 674 S.W.2d 685, 687 (Mo.App.1984).

Defendant was charged and convicted under § 570.120, RSMo 1986, which provides in pertinent part:

1. A person commits the crime of passing a bad check when, with purpose to defraud, he issues or passes a check or other similar sight order for the payment of money, knowing that it will not be paid by the drawee, or that there is no such drawee.

2. If the issuer had no account with the drawee or if there was no such drawee at the time the check or order was issued, this fact shall be prima facie evidence of his purpose to defraud and of his knowledge that the check or order would not be paid.

3. If the issuer has an account with the drawee, failure to pay the check or order within ten days after notice in writing that it has not been honored because of insufficient funds or credit with the drawee is prima facie evidence of his purpose to defraud and of his knowledge that the check or order would not be paid.

Subsections (2) and (3) of the statute create a presumption about defendant's purpose or intent and his knowledge. *State v. Kaufman,* 308 S.W.2d 333, 339–40 (Mo.App.1957).[2] If the state's evidence refutes the statutory presumption, the presumption disappears. *Id.* at 340. However, the state need not rely upon a statutory prima facie case but may rely on the actual evidence in order to prove defendant's intent and knowledge. *State v. Harden,* 613 S.W.2d 700, 703 (Mo.App.1981). Because a defendant's subjective intent is rarely open to direct proof, it may be shown by means of circumstantial evidence. *State v. Inscore,* 592 S.W.2d 809, 811 (Mo. banc 1980). Issuing a check with knowledge there are insufficient funds in the account is sufficient evidence of fraudulent intent to send the case to the jury.

**2.** *Kaufman* dealt with § 561.470, RSMo 1949, predecessor statute to § 570.120.3.

*State v. Davis,* 586 S.W.2d 748, 750 (Mo. App.1979).

We first deal with the New City Investment check. Defendant contends there was no evidence he knew the account was closed, no evidence he intended to defraud Mercantile because the check was payable to Central West End Group, no evidence defendant knew Alex would pass the check to Mercantile, and no evidence that Alex intended to defraud Mercantile or knew the check was bad.

■ There was no direct evidence, nor could it have been inferred, that Alex had knowledge that the New City Investment account at Woods Mill-Forty Bank was closed. If Alex's knowledge were a necessary element of this offense, defendant could not be convicted on the closed account check charge. However, defendant's actions alone satisfy the statutory elements for conviction of him on this count. A requirement that the jury find that he was an aider and abettor would create a greater burden than is necessary for the state to prove under that charge. Thus, we believe that defendant was not prejudiced by any failure of proof as to Alex. *See State v. Connell,* 523 S.W.2d 132, 136 (Mo.App. 1975).

■ Defendant contends there was insufficient evidence that he knew the New City Investment account was closed. While there is no direct evidence of these facts, we believe that from the evidence presented by the state and testified to by the defendant it can be inferred that the defendant knew the condition of this account. In October 1980, the account had a balance of less than $100 which was eliminated by a garnishment. The account had been closed nearly three and one-half years before defendant wrote the check, and no deposits had been made during that period of time. By his own testimony, defendant was president of New City Investment and, under the direction of the bankruptcy court, had been receiver for the company and directly in charge of its financial affairs.

■ Defendant's argument that there is no evidence that he intended to defraud Mercantile because the check was written to Central West End Group also is unsound. Defendant knew the condition of the New City Investment account at Woods Mill-Forty Bank and the condition of the Central West End Group account at Mercantile. In light of defendant's dual relationship to New City Investment and Central West End Group, the jury could reasonably infer that he knew the check would be deposited into the Central West End Group account and that Mercantile ultimately would suffer the loss. Just as the passing of a check with knowledge of insufficient funds in the account is sufficient evidence of fraudulent intent to send a case to a jury (*Davis,* 586 S.W.2d at 750), passing a check with knowledge that the account has been closed is sufficient evidence of fraudulent intent.

Concerning the insufficient funds check written to Mass Merchandisers on the Central West End Group account, defendant contends there was no evidence he acted with Alex in passing the check to Mass Merchandisers, Inc., no evidence that he had any intent to defraud Mass Merchandisers, and no evidence that showed he "knew there were insufficient funds in the account at the time the check was written, or that the check would not be paid."

■ We believe the state made a submissible case, with or without the statutory presumption of § 570.120.3, against defendant. There was evidence defendant acted with Alex in passing the bad check in that defendant wrote the check, signing his own name and Alex's name with Alex's authority, and that Alex was present when defendant passed the check to Singler. Also, there was evidence defendant knew there were insufficient funds in the account at the time the check was passed and that the check would not be paid. The record reveals that when defendant passed the check on March 16, 1984, and at all times thereafter, there were insufficient funds to pay the check to Mass Merchandisers along with other outstanding checks. The only time the account had a balance large

enough to pay the check to Mass Merchandisers was the period between March 19 when the account was credited for the $6,500.00 New City Investment check and March 21 when the account was debited $6,500.00 because the New City Investment check had been returned unpaid. Defendant had knowledge of the condition of the Central West End Group account and knowledge that the New City Investment check would not be honored. From this knowledge, it may be inferred that defendant had the requisite intent to defraud Mercantile.

■ In addition, the intent to defraud and knowledge the check would not be paid are satisfied by the statutory presumption triggered by the circuit attorney's 10–day letter. Defendant testified he received the letter and that he and Alex discussed it. However, the check was not paid by either. The state offered no evidence which would rebut the statutory presumption.

■ Defendant contends Mercantile officials had agreed to pay checks which overdrew the account. If the *state's case* had shown such an agreement or that defendant had some other reasonable expectation that the checks would be honored, then the statutory presumption would disappear. *Kaufman*, 308 S.W.2d at 340. But if evidence of an agreement comes only from defendant, then the question of the existence of an agreement is for the jury. As the court said in *Kaufman*, 308 S.W.2d at 339, in some cases, payment of checks by a bank which overdraw an account "may be an indication of the extension of a line of credit." However, the court added, "We are reluctant to say that a mere showing of the existence of overdrafts without anything more is an indication of an arrangement or understanding with the bank for payment of a check, or is an indication of the extension of a line of credit." *Id.* Although Mercantile officials admit that in two instances, *subsequent* to the passing of the check to Mass Merchandisers, the bank permitted two checks to clear, the bank officials offered a reasonable explanation why the bank paid the checks, and we conclude that this evidence did not rebut the statutory presumption.

Defendant was not deprived of the opportunity to present his evidence on this issue to the jury. However, we find no evidence that, at the time it was passed, the check had already been approved for payment or that any act by the bank indicated an agreement to provide a line of credit. Nor was there evidence of any line of credit agreement prior to presentment of the check on March 27. Although defendant testified he understood that the check would be honored, the only date for which he identifies a specific conversation with bank officials is April 11. The state made a submissible case.

■ Defendant raises three other points which have no merit and do not require extensive discussion. He contends the trial court erred in limiting the scope of his pro se closing argument. We have examined the limitations which defendant claims prevented him from arguing the evidence and reasonable inferences and find no error.

Defendant also alleges there was reversible error when the prosecutor, in his closing argument, stated:

I want to talk to you basically on things, on voir dire we said this was a presumption of innocence. Now, that is not a witness, that's a right given to the defendant. It doesn't mean or mean he is or is not innocent. That's presumption, if you didn't hear evidence of guilt then you would supposedly find him not guilty, and that is the nature of presumption. There's also another presumption that floats around in this case, and that is once he and his associates receive notices that these checks are bad, the intent to defraud is presumed. When he had gotten notices these things bounced, you can presume they intended to defraud.

Defense counsel did not object and the matter was not raised in the motion for new trial; therefore, he requests our review under the plain error standard.

■ Defendant relies on *State v. Watson*, 672 S.W.2d 701 (Mo.App.1984) where the prosecutor read the bad check statute, containing the phrase "prima facie evidence," to the jury. In reversing defendant's conviction in *Watson*, this court held that by reading the statute in the context

in which it was read, the entire burden of proof in the case was shifted to the defendant. *Id.* at 703. No such argument is made here and the statute was not read to the jury in this case. Defendant's request for relief on this point is denied.

Defendant also alleges the trial court erred in its finding that he was a prior and persistent offender. Thus, he contends, he was deprived of the right to have his sentence determined by the jury.

Section 558.021, RSMo 1986, sets forth the procedure by which a defendant is to be found a prior or persistent offender. Defendant contends the trial transcript does not record the necessary findings of fact to constitute proof beyond a reasonable doubt that defendant pleaded guilty in 1978 to five felony stealing counts. However, the supplemental transcript contains the required findings of fact, and state's exhibits 35 and 36, referred to in the supplemental transcript, are certified copies of the indictments, sentences, and judgments concerning those prior offenses. The requirements of § 558.021 were met by the trial court.

Judgment affirmed.

SMITH, P.J., and DOWD, J., concur.