**STATE of Missouri, Respondent,**

v.

**Freada P. CARROLL, Appellant.**

**No. SC 83044.**

Supreme Court of Missouri,
En Banc.

April 24, 2001.

Craig A. Johnston, Asst. Public Defender, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Karen L. Kramer, Asst. Atty. Gen., Jefferson City, for respondent.

## PER CURIAM.[1]

After a bench trial, Carroll was convicted of six counts of passing a bad check and one count of forgery. At a second bench trial on the same day, she was convicted of three counts of passing a bad check. She was sentenced to five years' imprisonment on each bad check count and seven years on the forgery count. All the sentences are concurrent. Carroll appeals.

The evidence is not sufficient to support the first six bad check counts, and the judgment as to those counts is reversed, and the case is remanded. The judgments as to the forgery count and as to the last three bad check counts are affirmed.

■ Rule 27.01(b) provides that the findings of the trial court shall have the force and effect of a jury. Therefore, appellate review is as though a jury has returned a verdict of guilty. If there is substantial evidence to support the findings of the trial court, its judgment is to be affirmed. In determining the sufficiency of the evidence in a criminal case after a verdict of guilty, the Court accepts as true all evidence in the record tending to prove the defendant's guilt together with inferences favorable to the state that can be reasonably drawn therefrom. The Court disregards all contrary evidence and inferences. *State v. Giffin,* 640 S.W.2d 128, 130 (Mo.1982)

The evidence supports the following. Carroll opened a checking account at Senath State Bank on August 26, 1996. On February 19, 1997, Carroll's account fell into a negative balance and never came above a negative balance through the end of June 1997. Around April 10, 1997, Senath State Bank "closed" the account. Nevertheless, Carroll received "bank statements" from Senath State Bank each month from February through July 1997. On February 19, 1997, the balance in the account was "minus" $135.76. The balance "starting April [1997] was minus $475.76." On June 9, 1997, the balance was "minus $595." None of these statements showed the account had been "closed." In July 1997, the bank accepted three deposits that were added to the account. At some point that month, the account had about a $1500 positive balance. Checks were paid from the account that month. After July 1997, Carroll's account again went into the negative numbers. It remained that way until Senath State Bank "closed" it, again,

---

1. These appeals were originally decided by the Court of Appeals, Southern District, in a per curiam opinion. Portions of that opinion are incorporated without further attribution.

in April 1998. After that, there were no further transactions.

Count I of the information alleged that Carroll committed the class D felony of passing a bad check "in that on or about the 14th day of May, 1997 ... the defendant, with the purpose to defraud, passed a check in the amount of $55.00, drawn upon a nonexistent account with the Senath State Bank, and payable to Wallace & Owens, knowing that such check would not be paid." The next five bad check counts were pleaded identically except for the date the check was passed, the amount thereof, and the payee.

Before the prosecutor filed the first case, his secretary mailed Carroll a "10 day notice" regarding each check on which these counts were based. Each notice warned Carroll that if she did not pay the check to which the notice pertained within ten days, the prosecutor would "file charges." All notices were addressed to 913 Starnes, Kennett, Missouri, the address printed on the checks. The mailing dates are: June 17, 1997; September 12, 1997; June 20, 1997; July 8, 1997; June 23, 1997, and June 20, 1997. The notices were not returned to the prosecutor's office.

Carroll did not respond within ten days after any notice. A letter from Carroll postmarked December 23, 1997, was received inquiring about making restitution. On February 24, 1998, three money orders were received from Carroll and applied toward the checks.

■ Carroll attacks the sufficiency of the evidence as to these six counts in that the evidence is insufficient to support a finding that: (a) she had no account in Senath State Bank when she passed the checks or (b) she knew she no longer had an account at that time.

Carroll emphasizes that each of these counts alleges the check was "drawn upon a nonexistent account with the Senath State Bank." She notes that although the bank purportedly closed her account around April 10, 1997 (before any of these checks were written), there was no evidence that the bank notified her the account was closed. Because each check was less than $150, each would constitute only a class A misdemeanor under section 570.120.4 unless Carroll "had no account with the drawee" at the time she passed them.

The testimony of Senath State Bank's cashier establishes that the bank "closed" Carroll's account around April 10, 1997. Furthermore, these checks were returned to the respective payees marked "ACCOUNT CLOSED." The evidence, however, also supports that Carroll continued to receive monthly statements from Senath State Bank after April 1997; that the bank accepted deposits to her account in July 1997; that the account had "about a $1500 positive balance" during that month; and that checks were paid from the account that month. Because of the latter evidence, Carroll asserts there was no proof beyond a reasonable doubt that she had no account with Senath State Bank when she passed these checks.

This case is not one where an accused drew a check on a bank where she never had an account. Carroll opened an account at Senath State Bank on August 26, 1996, and continued to receive monthly statements from the bank through July 1997, the month after she passed the last of these checks. Although the cashier testified the bank closed Carroll's account around April 10, 1997, the conduct of the bank in continuing to send Carroll monthly statements thereafter belies the notion that Carroll had no account after April 10. Furthermore, the deposits in July 1997–

the month Carroll's account reached "about a $1500 positive balance"-were evidently credited to the account Carroll had opened August 26, 1996–not to a new account created to receive those deposits.

The burden to prove beyond a reasonable doubt that Carroll had no account with Senath State Bank when she passed these checks was on the state. The evidence was insufficient to satisfy that burden. As the evidence was insufficient in that regard, it was insufficient to demonstrate Carroll *knew* she no longer had an account. The judgment as to these six counts is reversed.

■ Carroll also attacks the sufficiency of the evidence in that section 570.120.1(1)[2] requires the state to prove Carroll passed the checks with the purpose to defraud, knowing they would not be paid by Senath State Bank. Carroll maintains the evidence was insufficient to establish those elements. Although she offered evidence seeking to explain the negative balances, the trial court was not required to believe it. A reviewing court does not undertake to determine the credibility of witnesses or weigh the evidence; rather a reviewing court will defer to the trial court's superior position from which to determine the credibility of the witness. *State v. Blankenship,* 830 S.W.2d 1, 16 (Mo. banc 1992).

■ The trial court could have reasonably found from the evidence, beyond a reasonable doubt, that: (a) during the period from February 19, 1997, through June 30, 1997, there were no funds in Carroll's account, and (b) during the period when Carroll passed the checks—May 14, 1997, through June 8, 1997—Carroll knew from having received the "bank statements" that there were no funds in her account from which any of those checks could be

paid. Issuing a check with knowledge there are insufficient funds in the account is sufficient evidence of fraudulent intent to make a submissible case under section 570.120. *State v. Aldrich,* 724 S.W.2d 688, 692 (Mo.App.1987). This attack on the sufficiency of the evidence is rejected.

■ Under section 570.120.1(1), the state need not prove an accused had no account with the drawee bank in order to establish guilt of passing a bad check. The crime of passing a bad check is proven by evidence establishing that an accused passed a check with the purpose to defraud, knowing it would not be paid by the drawee. *State v. Madani,* 910 S.W.2d 362, 366 (Mo.App.1995). In rejecting this attack on the sufficiency of the evidence, the evidence is sufficient to establish those elements. Accordingly, the case is remanded to the trial court. On remand, the trial court may enter judgment declaring Carroll guilty of the class A misdemeanor of passing a bad check under each of these six counts and may assess punishment on each of those counts within the authorized range for a class A misdemeanor in sections 558.011.1(5) and 560.016.1(1).

■ Carroll also contests her forgery conviction. The forgery count alleged that Carroll, on or about January 3, 1997, with the purpose to defraud, altered a check on the account of Bobby R. Carroll, drawn upon Kennett National Bank, in the amount of $129.80 so that it purported to have been made with different terms. Carroll argues that the state failed to prove forgery beyond a reasonable doubt because the state did not present sufficient evidence.

The evidence indicated Carroll's husband, from whom she was separated, made out a check to "Kennett Cable Vision" for

2. All statutory references are to RSMo 1994.

$29.80. He put the check in his mailbox. Later, Kennett Cable Vision told him that his payment was late. Bank records received in evidence showed Senath State Bank received the check on February 10, 1997, for deposit to Carroll's account. Her account was credited with $129.80 on that date.

■ Carroll made two motions for judgment of acquittal. The first motion came after the state rested. The trial court overruled it. After that ruling, Carroll testified in her own defense. By doing so, she waived any claim of error regarding that ruling. *State v. Purlee*, 839 S.W.2d 584, 587 (Mo. banc 1992). After Carroll rested, the state announced it had no rebuttal evidence. Carroll thereupon moved for judgment of acquittal at the close of all the evidence. The trial court overruled that motion. The lone issue as to this argument is whether that ruling was erroneous. *Id.*

Carroll acknowledges that "a long line of cases" declares "possession of and attempt to pass a forged instrument raises a presumption or inference that the person in possession forged it and, unless its possession is explained to the satisfaction of the trier of facts, such presumption becomes conclusive." She asserts those cases cast upon an accused the burden of disproving an element of the State's case, contrary to *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, which requires the state to prove beyond a reasonable doubt every element of the alleged offense. Specifically, she urges that the state cannot put any burden on the defendant to prove his or her innocence, and the line of Missouri cases purporting to do so must be reversed. Applying that argument here, Carroll proclaims that the state did not prove that she altered the check, which is the act that is charged. According to her, the evidence established only that she may

have deposited a check written by Bobby Carroll and that someone had altered the check other than him.

While Carroll's argument might be plausible were the evidence different, it is meritless under the proof here. This is not an instance where an accused had unexplained possession of a forged instrument and passed it. Carroll avowed she acquired possession of the check directly from Bobby Carroll. Consequently, the state did not need to eliminate the possibility that, after the check was written, a third person acquired possession of it and altered the name of the payee and the amount before Carroll acquired possession.

Under Carroll's testimony, only two people could have changed the name of the payee and the amount—Bobby or her. Bobby swore he changed neither the payee nor the amount. Carroll swore Bobby changed the payee. It was the trial court's prerogative to believe Bobby's testimony that he did not alter the payee or the amount and to believe Carroll's testimony that she acquired possession directly from Bobby. *State v. Blankenship*, 830 S.W.2d 1, 16 (Mo. banc 1992).

On these facts, the trial court could have reasonably found beyond a reasonable doubt that Carroll altered the name of the payee and the amount before depositing the check to the credit of her account. That portion of the judgment as to Carroll's conviction of forgery is affirmed.

With respect to the last three counts of passing a bad check, the events began May 27, 1998. On that date, Carroll opened a checking account at First Midwest Bank of Poplar Bluff using the name "Freada P. Wood." Her address on the "signature card" was "HC6 Box 402, Doniphan, MO 63935." A "checking account statement" showed that on June 9, 1998, after an $800 check was paid from Carroll's account, the

balance in it was 16 cents. The balance remained at 16 cents until a $200 deposit June 15, 1998. Thereafter, the balance remained at $200.16 through June 28, 1998.

Meanwhile, on June 15, 1998, Paul Coleman opened a checking account at First Community Bank in Poplar Bluff with an initial deposit of $310. His address on the "signature card" was "HC R 6 Box 402, Doniphan, MO 63935."

The first count of the information alleged that Carroll committed the class D felony of passing a bad check "in that on or about the 16th day of June, 1998 … the defendant, with the purpose to defraud, passed a check in the amount of $275.00, check number 280, dated the 12th day of June, 1998, payable to First Community Bank, drawn upon First Midwest Bank, knowing that such check would not be paid[.]" The remaining two counts were pleaded identically except for the date the check was passed, the amount thereof, the check number, and the date on the check.

The evidence shows that on June 16, 1998, a teller at First Community Bank in Campbell cashed check number 280 in the amount of $275, dated June 12, 1998, drawn on Carroll's account at First Midwest Bank, payable to Paul Coleman, and signed by Carroll. First Midwest Bank received the check for payment June 17, 1998, but returned it to First Community Bank the next day because of insufficient funds.

On June 16, 1998, a teller at First Community Bank in Holcomb cashed check number 281 in the amount of $300, dated June 14, 1998, drawn on Carroll's account at First Midwest Bank, payable to Paul Coleman, and signed by Carroll. The head bookkeeper at First Midwest Bank testified the check was "returned insuffi-

cient through our system" June 17, 1998, to First Community Bank.

On June 17, 1998, a teller at First Community Bank in Malden cashed check number 299 in the amount of $275, dated June 13, 1998, drawn on Carroll's account at First Midwest Bank, payable to Paul Coleman, and signed by Carroll. The head bookkeeper at First Midwest Bank testified the check was "run through our system" June 18, 1998, and returned "insufficient" to First Community Bank.

Although each count pleaded that the subject check was payable to First Community Bank, the evidence on each count showed each check was payable to Paul Coleman. A copy of each check has been filed with this Court. On the reverse side of each is a signature appearing to be "Paul Coleman."

The state's theory at trial was that Carroll and Coleman shared the same address and there was a joint scheme between them to defraud First Community Bank. In support of that theory, the State presented evidence that in addition to the checks on which these three counts were based, Carroll wrote eight other checks payable to Coleman, each of which was passed at a First Community Bank facility in southeast Missouri. The cashier at First Community Bank testified that "one or two" of the eight checks were returned to First Community Bank marked "refer to maker," and "[t]he others were all insufficient." The cashier explained that the checks were "charged back" to Coleman's account.

At the conclusion of the evidence, Carroll's lawyer protested that all three counts charged Carroll with writing a check payable to First Community Bank, whereas the evidence showed all checks passed to First Community Bank were payable to Coleman. Before announcing its findings, the trial court granted the prosecutor leave to amend the three-count informa-

tion by interlineation to conform to the evidence. Pursuant to that ruling, the prosecutor marked through "First Community Bank" in each of the three counts and wrote "Paul Coleman."

Carroll claims as to these three checks that there was insufficient evidence that: (1) she passed the checks to Paul Coleman and (2) assuming arguendo that she did pass the checks to him, that at the time that she purportedly passed the checks to Coleman that she did so with the purpose to defraud.

Carroll concedes that the evidence was sufficient to support a finding that she signed the checks in question, that they were made payable to Coleman, and that at some point they were cashed. However, insists Carroll, there was no proof as to how Coleman obtained the checks, when or where he obtained them, or what he did with/to them.

The trial court could have reasonably found beyond a reasonable doubt that Carroll passed the checks to Coleman. The checks were obviously put into circulation, as they were cashed at various First Community Bank sites. Carroll wrote the checks on printed, personalized check forms bearing her name, address and Social Security number. It is a reasonable inference from the evidence that Carroll intended to turn the checks over to Coleman.

Furthermore, Carroll wrote at least eleven checks payable to Coleman in the aggregate amount of $3,375 during a ten-day period; those eleven checks were passed to First Community Bank during an eight-day period. All of that activity occurred during a span of twelve days (June 12, 1998 through June 23, 1998). That flurry of activity belies any notion that Carroll did not give the checks to Coleman promptly after writing them.

Given the evidence, Carroll's contention that there was insufficient evidence to support a finding beyond a reasonable doubt that she passed the checks to Coleman is rejected.

The remaining challenge to the sufficiency of the evidence as to these three checks is that there was no showing that she passed the checks with the purpose to defraud.

Carroll wrote the first of the eleven checks June 12, 1998—check 280 for $275. On that date, the balance in her account at First Midwest Bank was 16 cents. The only deposit to her account during the period when all eleven checks were written and passed to First Community Bank was a $200 deposit June 15, 1998. Obviously, that deposit was insufficient to pay any of the eleven checks.

Issuing a check with knowledge there are insufficient funds in the account on which the check is drawn is sufficient evidence of fraudulent intent to make a submissible case under section 570.120. *Aldrich,* 724 S.W.2d at 692.

The judgment as to these three checks is affirmed.

All concur.