

# In the Missouri Court of Appeals
## Eastern District
### DIVISION THREE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED105655 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| vs. | ) | |
| | ) | Honorable Joseph S. Dueker |
| RACHEL A. KINSELLA, | ) | |
| | ) | |
| Appellant. | ) | Filed: March 5, 2019 |

We recount an assault that is difficult to comprehend. The defendant, Rachel A. Kinsella, is a knowledgeable, medically-savvy mother. The victim is her medically-challenged young son, P.K. Over a nine-month period, defendant took her son to two different teams of doctors - one in Kansas City, the other in St. Louis. But due to the defendant's deceptions, the teams of doctors did not know of each other's existence. Thus, each team prescribed different anti-psychotic and anti-seizure medications fraught with severe, debilitating, even life-threatening consequences. Defendant's conduct brought P.K. to the brink of death.

After a three-day trial, a jury found defendant guilty of first-degree assault and first-degree endangering the welfare of a child, for poisoning her son, P.K. Defendant now appeals, alleging insufficient evidence existed that she acted "knowingly" or "intentionally." She contends the jury engaged in impermissible inference-stacking in convicting her. To the contrary, we find no attenuated logic. Sufficient evidence exists to reasonably infer that defendant acted knowingly and intentionally. We therefore affirm defendant's convictions.

## Factual and Procedural Background

### P.K.'s Early Years

P.K. was born prematurely in August of 2005. Around the time of his birth, he suffered a bleed in his brain that required the placement of a shunt to drain fluid off his brain, in order to reduce the pressure on his brain. At other times in his young life, doctors also variously diagnosed P.K. with epilepsy, attention deficit hyperactivity disorder (ADHD), cognitive disorder, autism spectrum disorder, Asperger's syndrome,[1] bipolar disorder, and as having a cerebrovascular accident. P.K.'s parents divorced in 2010. Two years later, in August of 2012, P.K.'s father died. P.K. was seven years old.

### Treatment Begins in Kansas City

A week and a half after the death of P.K.'s father, defendant took P.K. to see Dr. Shayla Sullivant, a child psychiatrist at Children's Mercy Hospital in Kansas City. This was P.K.'s first visit with Dr. Sullivant. In addition to corroborating the ADHD and cognitive-disorder diagnoses, Dr. Sullivant also diagnosed P.K. as having "adjustment disorder with depressed mood." Dr. Sullivant prescribed Risperdal, an anti-psychotic medication, and physicians in the neurology department at Children's Mercy prescribed Trileptal, an anti-seizure medication. Risperdal and Trileptal are the drugs with which defendant was alleged to have poisoned P.K. Dr. Sullivant reviewed the benefits and risks of the medications with the defendant. Dr. Sullivant specifically told defendant that Risperdal could lower the seizure threshold for P.K.

Defendant brought P.K. to see Dr. Sullivant three additional times during 2012, the last time being in November. Despite Dr. Sullivant wanting to see P.K. every eight weeks, defendant did not bring P.K. in for another visit until July 2013. During that eight-month time period,

---

[1] Asperger's syndrome is a developmental disorder; physicians often use the diagnosis when a child exhibits slightly "odd" behavior in their social interactions.

defendant repeatedly requested refills for the Risperdal. Dr. Sullivant initially approved those refills, but ultimately told defendant that she would only approve the Risperdal refill if defendant brought P.K. in for a visit, which finally occurred on July 26, 2013. Dr. Sullivant saw P.K. again in September, the last time she would see P.K. in 2013. Defendant canceled an appointment in November, and was a no-show at another appointment. When asked why, defendant told staff at Children's Mercy that she intended to seek treatment from a psychiatrist in St. Louis.

Despite this stated intent, defendant in February of 2014 again asked Dr. Sullivant for a refill of P.K.'s medications. Dr. Sullivant denied the request because P.K. was not scheduled for another visit at Children's Mercy. Dr. Sullivant was also concerned that defendant may have found another provider for P.K.'s care. Defendant denied that anyone else was prescribing medication for P.K. and stated that she was transferring all of P.K.'s care back to Children's Mercy. Defendant scheduled an appointment with Dr. Sullivant, for March 4, 2014. Given this, Dr. Sullivant authorized a refill of P.K.'s medications. Defendant brought P.K. in for the March 4th visit, but did not schedule a follow-up visit with the doctor, as instructed. Defendant did not bring P.K. to see Dr. Sullivant until nine months later, in December of 2014. During that ninth-month time period, defendant repeatedly requested and received refills for Risperdal and Trileptal from the doctors in Kansas City. During this same nine-month period, P.K. also received extensive medical treatment from doctors at St. Louis Children's Hospital.

### *St. Louis Hospitalization and Beginning of Treatment in St. Louis*

On March 7, 2014, three days after his visit with Dr. Sullivant, P.K. was life-flighted to St. Louis Children's Hospital after a reported prolonged seizure. When P.K. arrived at the hospital, he was extremely unresponsive. Medical staff could not awaken P.K., even by pinching him or rubbing his sternum – measures used by medical personnel to awaken unresponsive

patients. If he did awaken, it was only briefly and then he would fall back asleep. These prolonged, sudden spells of extreme unresponsiveness continued, on and off, for the next two months while P.K. was in the hospital. P.K. also had hallucinations and nystagmus.[2] He drooled and exhibited inappropriate emotional responses. He was also very unsteady, and often had trouble walking and with coordination. When asked to touch his nose or touch an object in front of him, P.K. would often miss. At other times, however, P.K. would appear normal, and was observed talking and playing video games. His periods of unresponsiveness were episodic, not continuous. His symptoms would wax and wane.

The St. Louis physicians ruled out an exacerbation of P.K.'s underlying illnesses. Tests also showed that P.K.'s shunt was functioning properly, and that the pressures inside his brain were within the normal range. And although defendant reported that P.K. had seizures, extensive monitoring showed no evidence of seizure activity. The doctors concluded that P.K.'s spells and periods of unresponsiveness were not seizures. They began considering other diagnoses, including that P.K. may have been experiencing an autoimmune disease affecting his brain. Tests came back weakly positive for such a disease, so the St. Louis physicians settled on a diagnosis of autoimmune encephalitis (AE) and began aggressively treating P.K. for that disease. Although monitoring did not show seizure activity, the St. Louis physicians could not completely rule out the possibility that P.K. was having undetected seizures. So they changed P.K.'s medications. The St. Louis physicians discontinued the use of Risperdal at the end of March 2014, and replaced it with a similar anti-psychotic medication called Seroquel, which they believed would be a better drug for P.K. They discontinued the use of Trileptal at the beginning of April 2014, and replaced it with a broader-spectrum seizure medication called Clobazam.

---

[2] Nystagmus is a condition of involuntary and uncontrollable eye movement where the eyes move back and forth, from side to side. The eyes can also move up and down, or in a circular motion.

4

The physicians in St. Louis had multiple discussions with defendant regarding the treatment plan for P.K. This included daily rounds, when physicians would visit P.K., review his progress, his lab results, and discuss the plan of care for the day. Defendant was frequently present with P.K., and sometimes slept at the hospital. Defendant told the St. Louis physicians that she was glad P.K. was receiving his care at St. Louis Children's Hospital, and that she was transferring care of P.K. to St. Louis from Kansas City. Defendant also told the St. Louis physicians that she was glad they discontinued the Trileptal because she never thought it very effective. Despite her representation that she was transferring care, and her awareness that the St. Louis physicians had discontinued the two medications, defendant continued to obtain refills of the two medications through Dr. Sullivant and Children's Mercy Hospital in Kansas City. Dr. Sullivant and the other Kansas City doctors did not know that P.K. was receiving medical treatment in St. Louis.

P.K. was discharged from the hospital in St. Louis in the middle of May 2014. At the time, P.K. still had a nasogastric (NG) tube in place, for feeding and medications.[3] Defendant rejected the option of placing P.K. in a short-term inpatient facility. She instead wanted to return home with the NG tube in place. Defendant wanted to be the one to feed P.K. and give him his medications. Defendant demonstrated no difficulties in using the NG tube, and so physicians sent P.K. home.

Thirteen days later, defendant and P.K. returned to St. Louis Children's Hospital because P.K.'s symptoms were "building up." P.K. was having trouble sleeping and was more unsteady. Physicians readmitted P.K. to the hospital. During the ensuing month-long admission, P.K. suffered a very severe episode where his level of consciousness became so impaired that he lost

---

[3] A nasogastric tube is a tube inserted into and through the nose, past the throat, through the esophagus, and down into the stomach, by which nutrition and medications may be administered.

5

his gag reflex and he was no longer protecting his airway. Physicians had to insert a breathing tube and place P.K. on a ventilator so that P.K. could breath. He was at risk of dying.

P.K.'s admission to St. Louis Children's Hospital in March of 2014 began a ten-month period of repeated hospitalizations for P.K. In all, between March 2014 and January 2015, P.K. was admitted to St. Louis Children's Hospital nine times and hospitalized a total of 168 days. He ultimately underwent surgery for placement of a gastrostomy tube (G-tube) in his stomach, which allowed for the administration of food, liquid, and medications directly into the stomach, rather than through the NG tube. The G-tube was necessary, as had been the NG tube, because P.K. was often comatose and unable to eat, drink, or swallow medication. Staff taught defendant how to use the G-tube tube, as they had done with the NG tube.

### Pheresis Treatments Begin

In August of 2014, the St. Louis doctors started P.K. on weekly pheresis plasma-exchange treatments. Pheresis is similar to dialysis, in that blood is taken out of the patient, filtered, and then returned to the patient's body. The pheresis process removes auto-antibodies and medications from a patient's blood. P.K. reported for his weekly treatments with varying degrees of unresponsiveness. He would arrive very sleepy, very unsteady, and sometimes unable to walk on his own. He could not control his body and was unable to point at an object. He was confused at times and had difficulty talking.

P.K. would be a little more alert immediately after treatment. Defendant reported that P.K. would get better for a few days after the pheresis treatment, become more active, alert, and able to walk with steadier movement, but then his symptoms would return, "like clockwork," necessitating yet another treatment the following week. P.K. underwent at least twenty pheresis treatments in the time period between August 2014 and the end of January 2015.

6

## *Continued Refills from Dr. Sullivant; Missed & Cancelled Appointments*

As noted, while P.K. was under the care of the doctors at St. Louis Children's Hospital, and after those physicians had discontinued and replaced the Risperdal and Trileptal, defendant continued to request refills for those medications from the Kansas City doctors. Defendant even requested refills on at least two occasions while P.K. was hospitalized in St. Louis. Dr. Sullivant approved the requests because P.K. was scheduled for an appointment with her on September 12th. However, defendant and P.K. did not show for that appointment. When asked why, defendant told Dr. Sullivant's staff that P.K. had seen doctors in St. Louis, and that there had been no change in P.K.'s psychiatric medications, as the St. Louis doctors "did not want to complicate the picture." Defendant further stated that they did not show for the September 12th visit because she had rescheduled the appointment to September 19th. Dr. Sullivant was wary of this excuse because she did not have clinic on September 19th, and her staff never scheduled an appointment during a time when she did not have clinic. Defendant rescheduled the appointment for September 22nd, but then rescheduled that appointment, stating that she and P.K. had missed a flight and were stuck out of town. Defendant rescheduled the appointment for October 13th, but then, without giving a reason, rescheduled the appointment for December 8th. During this time, defendant twice requested refills for Risperdal. Dr. Sullivant approved the requests, but in November told defendant that she would not authorize any more refills if defendant and P.K. did not come in for the December appointment.[4]

---

[4] Dr. Sullivant explained that it was a difficult decision to authorize refills for Risperdal when she had not seen P.K. for months. She had to weigh the risks and benefits, but in the end always tried to do what was in P.K.'s best interest. She knew it was not P.K.'s fault that he was not being brought in for appointments. She also explained that abruptly discontinuing Risperdal could be very harmful. To safely stop taking Risperdal, it must be tapered off gradually. Abruptly stopping the medication can cause withdrawal dyskinesia, meaning the patient can have abnormal movements, writhing movements, and very unusual distressing movements, all of which could require hospitalization. Dr. Sullivant also explained that she was getting feedback from defendant that the medication was helpful. And so, on balance, Dr. Sullivant thought it would do more harm to discontinue the medication, and so she continued to provide the refills.

7

## *Return to Dr. Sullivant, December 2014*

Defendant and P.K. arrived at Dr. Sullivant's office on December 8th, just five days after P.K.'s pheresis treatment in St. Louis. When P.K. arrived for that treatment, he "did not look great." He had what appeared to be a cold, and had trouble breathing during his treatment, necessitating doctors placing P.K. on oxygen, and admitting him to the hospital for overnight observation. Defendant did not tell Dr. Sullivant about this, or that P.K. was undergoing pheresis treatments in St. Louis. Rather, she told Dr. Sullivant that things were "going much better" since their last visit in March. Defendant related that P.K. had been diagnosed with AE while in St. Louis, but then told Dr. Sullivant that P.K. had gradually improved, and that the encephalitis had essentially resolved. However, P.K. had not improved, and at the time of this office visit with Dr. Sullivant, he was still being treated for AE by the St. Louis doctors.

On each visit to her office, Dr. Sullivant reviewed the medications that P.K. was taking, to ensure she had an accurate list. At this December 8th visit, defendant reported no changes in P.K.'s medications, except an allergy medication. Defendant did not tell Dr. Sullivant that St. Louis doctors had discontinued Risperdal and Trileptal and replaced them with similar medications. And she did not tell Dr. Sullivant about the chemotherapy drugs that P.K. was taking, which we will discuss below. Prior to this visit, Dr. Sullivant received a letter indicating that someone in St. Louis had been prescribing Seroquel for P.K. Seroquel was the replacement drug for Risperdal. When Dr. Sullivant asked about this, defendant stated that the St. Louis doctors had briefly prescribed Seroquel for P.K., but that P.K. was no longer taking it. Defendant did not volunteer this information but only mentioned it when Dr. Sullivant specifically inquired about the drug. However, the St. Louis doctors had not discontinued Seroquel, and pharmacy records showed that the prescription was being filled regularly.

8

Dr. Sullivant directly communicated with P.K. and the defendant for the last time at this appointment. At the time defendant and P.K. left the office, Dr. Sullivant was still prescribing Risperdal and Trileptal for P.K. She would not do so for long, however, as Dr. Sullivant and the St. Louis doctors connected the following month.

## *AE Diagnosis Questioned; Toxicology Testing*

Towards the end of 2014, the doctors in St. Louis began questioning their diagnosis of AE because P.K. was not responding as he should. P.K.'s symptoms kept recurring after his pheresis treatments. The doctors explained that a recurrence of AE after a pheresis treatment is extremely rare. Furthermore, P.K. recovered very quickly after pheresis, which is "absolutely" unusual for AE patients. Usually patients with AE take a week to three weeks to recover. But P.K. recovered almost immediately. In August of 2014, the St. Louis physicians had also started P.K. on a six-month course of a chemotherapy drug that works quite well for AE. But after taking the drug for nearly five months, P.K. was no better. It was becoming clear to the doctors that the chemotherapy was not helping. The physicians ultimately ruled out AE and began to look for other causes for P.K.'s symptoms. P.K. was a bit of a mystery for his St. Louis doctors.

Because P.K. responded to pheresis treatments, the St. Louis doctors still thought some substance in P.K.'s body, unknown to them, might be causing P.K.'s symptoms. They decided to send some of P.K.'s blood to a specialized toxicology lab in San Francisco. The doctors called this a "shot in the dark" to determine what was in P.K.'s body that caused his symptoms.

The shot in the dark struck its target. Results showed the presence of Risperdal and Trileptal, to the shock of the St. Louis doctors. P.K. should not have had those two drugs in his system because they had been discontinued many months earlier, in March and April of 2014.

9

The St. Louis medical team did not know that defendant was obtaining refills of these prescriptions from the Kansas City doctors.

*An "Accidental" Dosage*

P.K. returned to St. Louis Children's Hospital for pheresis treatment on January 21, 2015. During that visit, Dr. Alexander Fay, a pediatric neurologist involved in P.K.'s care, told defendant that the California lab had mentioned the presence of Trileptal in P.K.'s blood. At that point, defendant told Dr. Fay that she "forgot" to tell him that she "accidentally" gave P.K. a dose of that medicine – three tablets – the night before his January 6th pheresis treatment.[5]

Dr. Fay was surprised at this revelation, and that defendant had not contacted him about the "accidental" dose. Dr. Fay and defendant communicated quite often – by cell phone and text messages. Dr. Fay provided this service in particularly severe cases, so that families could have quick access to a neurologist. And Dr. Fay considered P.K. a severe case. He had never seen another case quite like P.K.'s According to Dr. Fay, defendant would often contact him with questions or reach out to tell him about all kinds of changes in P.K.'s condition. But Dr. Fay never received a message from defendant following the "accidental" dosage. Nor did Dr. Soe Mar, Dr. Fay's supervisor, an attending pediatric neurologist and professor at St. Louis Children's Hospital who was also involved in P.K.'s care. Dr. Mar was also surprised by the test results and defendant's revelation about the "accidental" dosage. To Dr. Mar, an "accidental" dosage "just didn't sound like" defendant. In Dr. Mar's opinion, defendant would have advised the staff at St. Louis Children's Hospital if she had accidentally dosed P.K. Dr. Mar described defendant as an "extremely competent mother." She explained that defendant was very articulate, that she gave a very good history, and that she could recite the exact medications that P.K. was taking, along with the doses of those medications. Dr. Mar further noted that defendant

---

[5] The St. Louis staff collected blood for the toxicology lab at that January 6th appointment.

10

documented her discussions with P.K.'s doctors in a book that she carried with her. Defendant never voiced any concern about how to administer medicine to P.K. Dr. Mar described defendant as a "very conscientious" and "extremely intelligent" mother who "knew exactly what she was giving."

Others shared this same impression of defendant. To them, defendant seemed "extremely competent." Dr. Fay described defendant as being "very on the ball" in terms of P.K.'s medications. Like Dr. Mar, Dr. Fay noted that defendant knew the names and doses of the medications off the top of her head, and that she had no difficulty pronouncing the names of those medications. According to Dr. Fay, defendant seemed quite familiar with each medication prescribed for P.K. She never appeared confused about P.K.'s medications. Dr. Sullivant echoed this assessment.

The St. Louis team collected more blood from P.K. on January 21st and sent it to the same toxicology lab for analysis. The doctors wanted to confirm the first findings, and wanted to see if any other substances were present that should not be in P.K.'s blood. This analysis showed the presence of Risperdal, Trileptal, and Strattera, a medication for ADHD that doctors had discontinued months before, in August of 2014.

The toxicology expert testified that Trileptal could not have been present in P.K.'s blood on both January 6th and January 21st if he had ingested the drug only the one time, as defendant represented. P.K. did not have a metabolic disorder, and had no problems metabolizing his medications. Whatever Trileptal was present in P.K.'s body at the time the blood was collected on January 6th would have been out of his system by January 21st. More than one dose had been administered.

11

## *Investigation & A New Diagnosis – Medical Child Abuse By Poisoning*

On discovering medications in P.K.'s system that should not have been there, Dr. Fay began investigating the source. He contacted pharmacies in the St. Louis area and found a single pharmacy that had been refilling Risperdal, Trileptal, and Strattera for P.K. from May of 2014 onwards. A new refill had been called in a month earlier, in December of 2014, by Dr. Sullivant in Kansas City.

Dr. Fay contacted Dr. Sullivant. They were each surprised by what the other had to say. Dr. Sullivant informed Dr. Fay that she had just seen P.K. and the defendant in December. Dr. Fay did not know about that visit. Defendant had not told him. Dr. Sullivant was surprised to hear that P.K. was receiving treatment in St. Louis. Defendant had told her that P.K. was better, that they were transferring his care back to Kansas City, and that she had been unable to find a St. Louis psychiatrist. Contrary to defendant's representations, Dr. Eric Spiegel, a psychiatrist at St. Louis Children's Hospital, was very actively involved in managing P.K.'s care from March of 2014 onwards.

From her earliest appointments with P.K., onward, Dr. Sullivant and defendant repeatedly discussed the need for coordinating P.K.'s care. Dr. Sullivant explained to defendant that coordination was important because anything one doctor does cannot only affect what other doctors do, but can also affect a patient's overall medical status. Dr. Sullivant believed defendant understood the importance of coordinating care among all providers.

After contacting the pharmacies and talking with Dr. Sullivant, Dr. Fay concluded that defendant was being deceptive about P.K.'s medications. Dr. Fay explained his reasoning. P.K. had medications in his system that were not supposed to be there, and defendant was not telling the St. Louis medical team that P.K. was taking those medications. Defendant was taking P.K. to

12

see two different sets of doctors, and getting medications from both sets of doctors, but was not telling the doctors about each other. The St. Louis team was prescribing one set of medications for seizures and psychiatric problems, and that Kansas City team was prescribing another set of medications for seizures and psychiatric problems. And neither hospital knew of the other. Neither medical team realized that P.K. was receiving treatment – and most particularly medications – from both hospitals during the time period of March 2014 to January 2015. Dr. Fay and the doctors in St. Louis diagnosed P.K. with "medical child abuse by poisoning."

### *Readmission, Restricted Access, & Improvement*

Dr. Fay and Dr. Mar met with the child-protection team at St. Louis Children's Hospital in late January of 2015. The team recommended that they bring P.K. into the hospital immediately because his life could be in danger. Under the guise of a needed change in P.K.'s medications, Dr. Fay contacted defendant and asked her to bring P.K. to the hospital. Defendant and P.K. arrived later that same day. The doctors admitted P.K., put him on 24-hour surveillance with a sitter in his room at all times, and restricted defendant's access to her son. She could no longer feed him or be alone with him.

P.K. arrived sleepy. By the next morning, P.K. looked the best Dr. Fay had seen him in months. This shocked Dr. Fay. Typically, P.K. underwent pheresis treatments on Wednesdays. He would improve slightly over the weekends, and then his symptoms would worsen. He would be a little worse on Monday, more so on Tuesday, and then would need pheresis again on Wednesday. Here, P.K. was admitted on a Monday evening. The very next day, Tuesday, when P.K. typically would have declined to the point of being unsteady and being difficult to wake up, P.K. was bright-eyed and running around, full of energy. The same was true the next day, Wednesday, when P.K. typically would have needed pheresis. But on this Wednesday, P.K.

13

looked like a normal child. P.K. did not undergo pheresis that day, because it was not needed. P.K. had gone from death's door to being a relatively healthy child – and he did so abruptly, which doctors said was very unusual.

In light of the lab results and P.K.'s sudden improvement after restricting defendant's access to P.K. – the only thing different in P.K.'s routine – Dr. Mar and Dr. Fay concluded that P.K. was receiving medication that he was not supposed to. Child Protective Services took custody of P.K. and totally excluded defendant from seeing her son.

P.K. underwent no further pheresis treatments. Doctors adjusted P.K.'s medications, and he continued to improve. From the end of January 2015 forward, P.K. looked like a normal child. The St. Louis doctors ultimately discharged P.K. to his paternal grandparents' supervision. Dr. Fay cared for P.K. until the end of the doctor's residency in June of 2015. At that time, P.K. was fine. At the time of trial, in March of 2017, P.K. was not on any medications, he was not having any seizures, he had no epilepsy, no ADHD, and no Asperger's. His feeding tube had been removed. And he was doing well in school. P.K. was seeing Dr. Mar every six months, and the doctor was contemplating extending those visits to once a year. Dr. Mar would not assign a diagnosis to P.K., other than being a child with a past medical history of a number of diagnoses. P.K. was considered a "well-care" patient.

## *The Medications - Their Effects and Dangers*

The various doctors explained the effects – and dangers – of the various medications that P.K. was taking. Dr. Mar explained how she and Dr. Fay were horrified on discovering Risperdal and Trileptal in P.K.'s system. The two drugs, if given at inappropriate doses, can cause a depressed level of consciousness, unsteadiness, and interference with one's appetite. P.K.'s symptoms were consistent with an inappropriately high dose of Risperdal. And indeed,

14

P.K. was receiving a much higher-than-normal dose of Risperdal. The blood tests in January of 2015 showed that the level of Risperdal in P.K.'s blood was four to five times greater than the normal limit.

Moreover, P.K. was being given the Risperdal in addition to Seroquel. And the combined administration of Risperdal and Seroquel is not standard practice. Dr. Jamie Kondis, one of the treating physicians in St. Louis, testified that although Risperdal and Seroquel could possibly be prescribed together, such an instance would be "very odd." And she was not aware that the two medications could be prescribed together for children. Dr. Sullivant stated she would have discontinued P.K.'s Risperdal prescription had she known he was taking Seroquel because the medications are from the same family of anti-psychotic medications, and thus have many of the same effects. Dr. Sullivant explained that giving both medications at the same time risks cumulative side effects such as drowsiness, mental state changes, mental slowing, and cognitive changes. Ataxia – an unsteady gait – and tremors are possible. In tandem, the drugs also affect heart function by reducing the patient's heart rate and putting the patient at risk for an arrhythmia. The two drugs together also lower the seizure threshold, and can lead to a permanent movement disorder. Anti-psychotic drugs also increase the risk of weight gain and increase the risk of diabetes. And it was not just the combination of Risperdal and Seroquel that caused concern. Dr. Sullivant explained that being a patient on the number and combination of drugs that P.K. was receiving all at the same time posed many great dangers.[6] These negative effects include lowering the seizure threshold, a sedating effect, and cognitive slowing.

---

[6] P.K was taking many medications, not just the combination of Risperdal/Trileptal - Seroquel/Clobazam. The evidence at trial, and our discussion here, focuses on these medications because they were said to be the ones by which defendant poisoned P.K. His St. Louis medications included Seroquel (anti-psychotic), Clobazam (seizures), Quillivant (ADHD), Clonidine (used to treat high blood pressure and ADHD). His Kansas City medications included Risperdal (anti-psychotic), Trileptal (seizures), Diastat (seizures), Lamictal (seizures), and Strattera (ADHD).

From March 2014 to January 2015, defendant refilled P.K.'s Kansas City prescription for Trileptal twelve times and his Risperdal prescription eleven times. Both were filled on nearly a monthly basis, or sooner. In the same time period, defendant refilled P.K.'s St. Louis prescription for Seroquel nine times. The dates when the St. Louis prescription was filled overlapped the dates when the Kansas City prescriptions were filled.

### *P.K. Poisoned*

The doctors explained that although P.K.'s medications were appropriate for treating the various symptoms for which they were prescribed, any medication, if given inappropriately, can be poisonous. The problem in P.K.'s case was the inappropriate doses, the combination of drugs, and the fact that the doctors did not know the full extent of the medications ingested by P.K.

Dr. Kondis testified that the combination of Risperdal and Trileptal with other anti-seizure medication and Seroquel led to an "overdose" that caused P.K.'s abnormal symptoms. Dr. Fay testified likewise that P.K. had been poisoned with inappropriate levels of Risperdal and Trileptal, which overlapped medications prescribed by the St. Louis doctors for seizures and psychiatric problems. This explained P.K.'s depressed level of consciousness and unsteadiness. Dr. Mar testified that defendant committed medical child abuse when she added extra multiple medications on top of others without telling P.K.'s doctors. Dr. Mar and Dr. Fay each concluded to a reasonable degree of medical certainty that P.K. had been poisoned.

### *An Inheritance*

When P.K.'s father died in August of 2012, P.K. became the sole beneficiary of his father's estate, which became a conservatorship for P.K. The conservatorship initially contained about $276,000 in assets. P.K.'s aunt serves as the conservator, and manages the conservatorship assets for P.K. The conservatorship is scheduled to end when P.K. turns

16

eighteen years old. Any assets remaining in the account will be paid out to P.K. Defendant initially petitioned the probate court in October of 2013 to receive a monthly stipend from P.K.'s conservatorship based on a submitted budget of expenses. The probate court awarded her $1,150 monthly. The conservator and her attorney thought defendant's budget a little excessive. On hearing this, defendant "got very angry" and stated, "I don't know why you're not giving me this money, his prognosis is poor, he may not make it anyway." In March of 2014, after P.K. was admitted to St. Louis Children's Hospital, defendant petitioned for more money from the conservatorship. The probate court awarded her an additional $500 per week, over and above the monthly stipend, during P.K.'s hospitalizations. After P.K. started his weekly pheresis treatments, defendant petitioned the probate court for additional funds for an apartment in St. Louis in which she and P.K. could live while P.K. underwent his treatments. For this request, defendant received essentially the same amount from P.K.'s conservatorship as she received when he was hospitalized. The payments from the conservatorship were deposited into defendant's bank account and used at defendant's discretion without further oversight by the conservator.

### The Charges and Trial

The State charged defendant with committing two felonies: first-degree assault and first-degree endangering the welfare of a child. A jury found defendant guilty as charged. The trial court sentenced defendant as a prior offender to concurrent terms of twenty-five years' imprisonment on the assault count and seven years' imprisonment on the endangerment count. Defendant appeals, challenging the sufficiency of the evidence to support the convictions.

### Standard of Review

When a defendant challenges the sufficiency of the evidence, our review is limited to a determination of whether the State introduced sufficient evidence from which a reasonable juror could have found defendant guilty beyond a reasonable doubt. *State v. Naylor*, 510 S.W.3d 855, 859 (Mo. banc 2017). In conducting our review, we accept as true all evidence favorable to the State, including all favorable inferences drawn from the evidence. *Id.* We disregard all evidence and inferences contrary to the verdict. *Id.* Conflicts in the evidence, the determination of the credibility of witnesses, and the weight to be given their testimony are issues for the jury to resolve, not this Court. *State v. Newberry*, 605 S.W.2d 117, 121 (Mo. 1980). And we give great deference to the trier of fact. *Naylor*, 510 S.W.3d at 859. This Court does not weigh the evidence anew. *State v. Nash*, 339 S.W.3d 500, 509 (Mo. banc 2011). Rather, our assessment is whether, in light of the evidence most favorable to the State, any rational fact-finder could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

### Discussion

The defendant contests both convictions, specifically the sufficiency of the evidence regarding the requisite mental state for each offense. Due to identical mental states, and the similarity of evidence to support each conviction, we address both offenses together.

The State charged defendant with committing first-degree assault. A person commits the offense of first-degree assault if the person "... knowingly causes ... serious physical injury to another person." Section 565.050.1. In accord with this charge, the trial court instructed the jury to find defendant guilty of first-degree assault if they believed beyond a reasonable doubt that between March 7, 2014, and February 11, 2015, the defendant "knowingly caused serious physical injury to P.K. by poisoning him."

18

The State also charged defendant with committing first-degree endangering the welfare of a child. A person commits the offense of first-degree endangering the welfare of a child if the person "knowingly acts in a manner that creates a substantial risk to the life, body, or health of a child less than seventeen years of age...." Section 568.045.1(1). In accord with this charge, the trial court instructed the jury to find defendant guilty if they believed beyond a reasonable doubt that in the same time period, the defendant "intentionally poisoned" P.K., that in doing so, the defendant "created a substantial risk to the life or body or health of P.K.," and that the defendant "acted knowingly" with respect to the facts and circumstances submitted in the instruction.

Defendant claims insufficient evidence existed to show that she acted "knowingly" or "intentionally." A person acts "knowingly" with respect to a result of their conduct when the person "is aware that his or her conduct is practically certain to cause that result." Section 562.016.3(2). "Intentionally" is synonymous with "purposely." *See State v. Goebel*, 83 S.W.3d 639, 644 (Mo. App. E.D. 2002). And a person acts "purposely" with respect to their conduct when it is their "conscious object to engage in that conduct or to cause that result." Section 562.016.2.

"Mental state is rarely capable of direct proof." *State v. Montiel*, 509 S.W.3d 805, 808 (Mo. App. S.D. 2016)(quotations omitted). "Proof of a requisite mental state is usually established by circumstantial evidence and permissible inferences." *Id.* "An 'inference' is a conclusion drawn by reason from facts established by proof; a deduction or conclusion from facts or propositions known to be true." *State v. Waller*, 163 S.W.3d 593, 595 (Mo. App. W.D. 2005)(internal quotations and citations omitted). "An 'inference' is different from a 'supposition,' a supposition being a conjecture based on the possibility that a thing could have happened." *Id.* "It is an idea or a notion founded on the probability that a thing may have

19

occurred, but without proof that it did occur." *Id.* "A criminal conviction cannot be based upon probabilities and speculation." *State v. McMullin*, 136 S.W.3d 566, 573 (Mo. App. S.D. 2004).

"In determining whether the defendant possessed the requisite mental state, the jury may look at evidence of and draw inferences from the defendant's conduct before the act, during the act, and after the act." *Montiel*, 509 S.W.3d at 809. The jury is entitled to consider a defendant's attempts to conceal evidence as providing further evidence of guilt. *Id.* And, when proven false, exculpatory statements evidence a consciousness of guilt. *Id.*

Defendant admits that the evidence permits the following three inferences: (1) that she was deceptive with her son's medications between two sets of treating physicians at two hospitals, and that this deception betrayed a general guilty conscience; (2) that she was an "unusually medically-savvy" mother; and (3) that by process of elimination, it was her administration of Risperdal and Trileptal that caused P.K.'s symptoms. But she argues these parallel inferences of her guilt are not tantamount to the further inference that she was aware giving her son the drugs was practically certain to poison him. She argues that the ultimate inference of her criminal culpability – that she acted knowingly – is a separate, further inference, requiring its own evidentiary basis, which defendant claims is lacking. In defendant's view, given the evidence presented, any inferences or conclusions that she knowingly poisoned her son would be too remote and attenuated as to be unreasonable, and would require the jury to engage in impermissible inference-stacking.

Missouri cases do refer to a rule prohibiting "piling inference upon inference" or "inference stacking." *State v. Putney*, 473 S.W.3d 210, 220 (Mo. App. E.D. 2015) Courts and scholars have sharply criticized and even doubted the very existence of the "rule." *McMullin*, 136 S.W.3d at 572 n.5 (citing *Braun v. Roux Distrib. Co.*, 312 S.W.2d 758 (Mo. 1958), *Wills v.*

20

*Berberich's Delivery Co.*, 134 S.W.2d 125, 129 (Mo. 1939), and *State v. Ashcraft*, 116 S.W.2d 128 (Mo. 1938)); *State v. Lottie*, 648 S.W.2d 908, 910 (Mo. App. W.D. 1983)("substantial criticism" leveled at the use of the term, citing 2 F. Harper & F. James, The Law of Torts §19.4 (1956); Annot., 5 A.L.R.3d 100 (1966); and 1 J. Wigmore, Evidence §41). This purported rule "is essentially based on the fact that an inference cannot be based on insufficient evidence." *McMullin*, 136 S.W.3d at 572 n.5 (quoting 31A C.J.S. §133 at 274). The rule, as most frequently stated, prohibits an inference "where an initial inference is drawn from a fact, and other inferences are built solely and cumulatively upon the first, so that the conclusion reached is too remote and has no sound logical foundation in fact." *Putney*, 473 S.W.3d at 220. The rule is not a general rule applying to all situations, but rather is a "rule of reason to guard against attenuated reasoning." *Id.* A verdict "cannot rest upon the piling of an inference upon an inference when there are no facts supporting the first inference." *McMullin*, 136 S.W.3d at 572 (citing *State v. Ring*, 141 S.W.2d 57, 64-65 (Mo. 1940); *Ashcraft*, 116 S.W.2d at 132; and 31A C.J.S. Evidence §133 at 274-75 (1996)). In the end, the underlying question is "whether the conclusion hypothesized can fairly be drawn from the proven facts by reasonably intelligent minds." *Putney*, 473 S.W.3d at 220; *McMullin*, 136 S.W.3d at 572 n.5.

"The pronouncement against an ultimate inference arrived at solely by basing an inference upon an inference is aimed at inferences drawn solely from previous inferences and otherwise unsupported, so that the evidence becomes too remote." *Morris v. E.I. DuPont de Nemours & Co.*, 109 S.W.2d 1222, 1228 (Mo. 1937)(internal quotation omitted). But it is well-settled that any number of inferences may be drawn in a given case provided each rests upon and reasonably arises from and out of facts and circumstances shown by the evidence. *Id.*; *Putney*, 473 S.W.3d at 220. And it is well-established that several inferences may be drawn from and

sustained by the same set or same phase of the facts in evidence. *Morris*, 109 S.W.2d at 1228; *Ring*, 141 S.W.2d at 64-54. The proscription against inference-stacking does not extend to drawing several inferences from the same proven facts if each inference is supported by those facts. *State v. Alexander*, 581 S.W.2d 389, 390-91 (Mo. App. E.D. 19979); *accord State v. Holman*, 556 S.W.2d 499, 509 (Mo. App. 1977). Nor is an inference based in part upon another inference and in part upon proven facts prohibited. *Id.* (noting such inference approved as being a parallel inference, provided it is a reasonable conclusion for the jury to deduce). Even though several inferences may be necessary to make a case, a party is entitled to the benefit of them all, provided the inferences are based upon facts and circumstances in evidence. *Morris*, 109 S.W.2d at 1228. The inferences may be concentrated and become the basis for an ultimate or final finding of liability. *Id.* at 1229. "The presence of parallel inferences consistent with guilt may be sufficient to support a finding of guilt." *Putney*, 473 S.W.3d at 220; *Lottie*, 648 S.W.2d at 911.

Defendant alleges insufficient evidence existed for a reasonable juror to find that she acted intentionally or that she was aware that continuing to medicate P.K. with the two drugs, Risperdal and Trileptal, was practically certain to cause P.K. serious physical injury, or create a substantial risk to P.K.'s life, body, or health. It is true that a number of inferences must be drawn in this case, but we perceive no issue of attenuated logic. Sufficient evidence exists to support each inference. A juror could reasonably infer from the collective impact of the evidence of defendant's actions, inactions, and deception that defendant acted with knowledge.

No debate exists that P.K. suffered serious physical injuries from the medications. His symptoms were consistent with inappropriately-high dosages, as well as the overlapping

22

combination of drugs. According to P.K.'s attending physicians, the combination of drugs led to an overdose. P.K. was at death's door. He had been poisoned.

And no debate exists that defendant gave P.K. the two medications. Defendant admits the evidence shows that she was administering Risperdal and Trileptal. Defendant repeatedly sought and obtained refills for the medications. A St. Louis pharmacy filled those prescriptions, on a monthly basis, from March 2014 forward. The blood analysis performed in January of 2015 showed both drugs in P.K.'s system. Defendant had ready access to P.K., and she knew how to administer medications through his NG and G-tubes. P.K.'s health did not decline once physicians restricted defendant's access to her son. The question here is not whether defendant gave the drugs to P.K., but her mental state when giving them.

Defendant appeared to understand the need for coordinating P.K.'s care among all providers. Dr. Sullivant repeatedly stressed the importance of coordinating care, explaining to defendant that anything one doctor does can affect what others do, and more than that, can affect the patient's overall medical status. Further, Dr. Sullivant reviewed the risks of the medications with defendant. She warned about Risperdal's potential effect on other anti-seizure medications, and specifically told defendant that Risperdal could lower the seizure threshold for P.K. From this evidence, a juror could reasonably infer that defendant was on notice that a combination of medications, without coordination of care, could have substantial and negative effects on P.K.

Defendant admits the evidence permits an inference that she was an "unusually medically-savvy" mother. Doctors described defendant as "extremely competent" and "very on the ball" about P.K.'s medications. Defendant documented her discussions with P.K.'s doctors, and knew the names and doses of P.K.'s medications off the top of her head. She was familiar with each medication, and never appeared confused about P.K.'s medications. Dr. Mar

23

described defendant as an "extremely intelligent" mother who knew exactly what she was giving P.K. Further, Dr. Sullivant had reviewed the risks of the prescribed medications. And defendant had many discussions with the St. Louis doctors regarding P.K.'s treatment plan. She clearly knew that they had discontinued the Risperdal and Trileptal, and replaced them with similar medications. A juror could reasonably infer that a medically-savvy defendant understood that the combination of similar drugs could and would have negative effects on P.K.

Defendant knew full-well that the St. Louis doctors had discontinued the Risperdal and Trileptal and replaced them with similar drugs. Yet defendant repeatedly sought authorization for refills, and had those medications refilled on a monthly basis after they were discontinued. Defendant even refilled the two medications while P.K. was in the St. Louis hospital. A juror could reasonably infer that defendant had no need to refill the two prescriptions unless she had some nefarious purpose.

Defendant obtained refills of the two prescriptions from the Kansas City doctors, but did not follow up with visits with those doctors. Defendant did not schedule appointments as directed. She repeatedly rescheduled and missed appointments. On at least three occasions, defendant returned for an office visit only after Dr. Sullivant said that she would no longer authorize refills unless defendant brought P.K. in for an office visit. On one occasion, defendant told Dr. Sullivant that she and P.K. had missed an appointment because she had rescheduled the appointment – to a day when Dr. Sullivant did not have clinic. In light of Dr. Sullivant's testimony, explaining that her staff would not have scheduled an appointment on a non-clinic day, a juror could reasonably conclude that defendant was being less-than-truthful with Dr. Sullivant. A juror could reasonably infer from defendant's false statements and her pattern of

24

behavior, that defendant was not exemplifying good-faith care, but was trying to keep P.K. out of Dr. Sullivant's purview.

In May of 2014, when doctors sought to discharge P.K. from the hospital with a NG tube in place, defendant refused to place P.K. in a short-term care facility. Instead, she wanted to return home. She wanted to be the one to feed P.K. and give him his medications. A juror could reasonably infer that defendant wanted P.K. in an unsupervised environment, so that she could easily give him the two discontinued medications.

Critically, while giving these medications, defendant observed P.K.'s symptoms. She was his mother, his caretaker. She was frequently at P.K.'s side. Defendant saw P.K. extremely unresponsive. She saw P.K. have trouble walking and have trouble with coordination. She saw P.K. confused. She saw P.K. have difficulty talking. She saw P.K. when he needed a feeding tube in order to eat. She saw P.K. when he needed a breathing tube and ventilator in order to breathe. She saw P.K. near death. She saw all this. And all this occurred while she was giving P.K. both sets of medications. Defendant knew she was giving both sets of medications. She saw what was happening to her son. She even remarked to P.K.'s aunt that P.K. might not make it. Without question, the evidence shows that the defendant knew P.K. was in serious, even critical condition. Further, she saw P.K. get better after pheresis, when medications had been removed from his blood, and then decline, "like clockwork," so that he needed yet another treatment. A juror could reasonably infer that P.K.'s decline after pheresis was caused by defendant resuming the discontinued medications, Risperdal and Trileptal. Furthermore, a juror could reasonably infer that a medically-savvy defendant, insistent on administering her son's medications and observing her son's symptoms return like clockwork, knew that giving P.K. the discontinued drugs in addition to the replacement drugs imperiled her son. This is especially so,

25

in light of the seemingly endless evidence of defendant's deceptive behavior. The evidence of defendant's deception is the most incriminating.

Defendant was less than forthcoming about who was providing P.K.'s medical care. Despite her understanding the need to coordinate care, defendant kept both sets of physicians in the dark. She did not tell the Kansas City doctors that P.K. was receiving treatment in St. Louis. Instead, defendant told Dr. Sullivant in early 2014 that despite her stated intent to seek treatment in St. Louis, she was transferring P.K.'s back to Kansas City because she could not find a psychiatrist in St. Louis. And though this is before P.K. came under the care of the medical team at St. Louis Children's Hospital, defendant never corrected this representation to Dr. Sullivant. Defendant did not tell Dr. Sullivant about P.K.'s pheresis treatments, or his chemotherapy, or his lengthy and numerous hospitalizations in St. Louis. Similarly, defendant did not tell the St. Louis doctors that P.K. continued under the care of the Kansas City medical team. Instead, defendant told the St. Louis doctors that she was glad P.K. was receiving his care at St. Louis Children's Hospital, and that she was transferring P.K.'s care from Kansas City to the medical team in St. Louis.

Defendant admits the evidence shows that she was deceptive regarding P.K.'s medications. Indeed. Despite knowing that the St. Louis physicians had discontinued Risperdal and Trileptal, and telling the St. Louis doctors that she was glad they had discontinued the Trileptal, defendant continued to refill the prescriptions for the two drugs. And she did not tell the St. Louis doctors that she continued to give P.K. those medications. Defendant and the St. Louis doctors had many discussions about P.K.'s care, and the doctors struggled with a diagnosis for P.K. But defendant never told them that P.K. was still taking the two drugs. Defendant practiced similar deceit in Kansas City. Twice defendant told Dr. Sullivant that St. Louis doctors

26

had not changed P.K.'s medications, when they had. In December of 2014, defendant gave Dr. Sullivant an incomplete list of medications. Most especially, defendant did not tell Dr. Sullivant that St. Louis doctors had discontinued the Risperdal and Trileptal, and replaced them with similar drugs. Defendant reported a change in P.K.'s allergy medication, but did not tell Dr. Sullivant about changes regarding the more critical anti-seizure and anti-psychotic medications that P.K. was taking. Nor did she tell Dr. Sullivant about the chemotherapy. Defendant also told Dr. Sullivant that P.K. was no longer taking the drug Seroquel when he was still taking the drug, and had been for nearly nine months.

Defendant lied to Dr. Sullivant about P.K.'s medical condition. Though she told Dr. Sullivant that P.K. had been diagnosed as having AE, she also said that the disease had essentially resolved and that P.K. was "much better" since his last visit with Dr. Sullivant the previous March. Defendant made these representations when P.K. was not improved and the St. Louis doctors were still treating him for AE.

A juror could find defendant's actions in January of 2015 very telling. After the St. Louis doctors discovered drugs in P.K.'s system that should not have been there, defendant stated that she "accidentally" gave P.K. a dose of Trileptal. Defendant only disclosed this after being confronted by Dr. Fay. Defendant said she "forgot" to tell the doctors – but this "forgetfulness" did not correspond with defendant's history of constant communication with Dr. Fay. Nor did an "accidental" dose correspond with defendant's reputation of being a "medically-savvy" and "extremely intelligent" caregiver. Further, defendant claimed that she gave just the one accidental dose. But test results clearly belied this assertion, and showed that more than one dose had been administered.

27

Defendant's deception reasonably supports a number of inferences. A juror could reasonably infer that there was no need to keep the doctors in the dark unless defendant had a nefarious purpose. A juror could reasonably infer that a medically-savvy defendant knew what she was doing, and that she kept both sets of doctors in the dark in order to keep the supply line of drugs open. A juror could reasonably infer that defendant's numerous false statements indicated a consciousness of guilt on the part of defendant in continuing to administer the Risperdal and Trileptal.

In sum, defendant knew Risperdal and Trileptal had been discontinued and replaced with other similar medications. Yet, she kept giving those discontinued drugs, in addition to the replacement medications. And she was deceptive in doing so. While giving this double dose of medications, defendant repeatedly saw P.K. in serious condition – even near death on more than one occasion. She saw P.K. get better and then decline. Her deceit bespeaks a consciousness of guilt. A juror could reasonably conclude from the extent and pattern of defendant's misrepresentations, and her acts of commission and omission, which occurred over a nine-month period, that what otherwise might be considered accidental, negligent, or reckless conduct was indeed knowing and intentional. Sufficient evidence exists to support a finding that defendant knew that giving P.K. the two drugs, Risperdal and Trileptal, was practically certain to put P.K.'s life, body, and health at risk, and cause him serious physical injury.

The evidence also supports a finding that defendant acted purposely. Such a conclusion is most particularly supported by defendant's conduct in continuing to refill and administer medications she knew were discontinued, and her deception in doing so. Making an extraordinarily sad case yet more depressing, the evidence also showed a possible motive for defendant's actions. Defendant could benefit financially if P.K. was sick. Whenever P.K. was

28

hospitalized, or undergoing pheresis treatments, defendant received an additional $500 a week, over and above the monthly stipend from P.K.'s conservatorship account. Defendant used these funds at her discretion, without any oversight. A juror could reasonably conclude that defendant intentionally gave the medication to P.K., to make him ill, in order to receive the extra money.

Sufficient evidence existed. The trial court did not err in entering a judgment of conviction and sentence on both counts. We deny the defendant's points and affirm the trial court's judgment.

_____
LAWRENCE E. MOONEY, JUDGE

SHERRI B. SULLIVAN, P.J. and
JAMES M. DOWD, J., concur.

29