

# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | **WD85109** |
| Respondent, | ) | |
| v. | ) | **OPINION FILED:** |
| | ) | |
| JOSEPH DUANE ELLEDGE, | ) | **August 1, 2023** |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Boone County, Missouri
The Honorable Jonathan Hasbrouck Jacobs, Judge**

**Before Division Two:  Alok Ahuja, Presiding Judge,
Anthony Rex Gabbert, Judge, and Thomas N. Chapman, Judge**

Following a jury trial, Joseph Elledge ("Elledge") was convicted of second-degree murder.  In his sole point on appeal, Elledge argues that the State failed to produce sufficient evidence that Elledge intentionally killed his wife ("Victim").  We affirm.

## Background[1]

Elledge and Victim were married in September of 2017.  In October of 2018, Victim gave birth to a daughter.  Victim's parents traveled to the United States from

---

[1] "We view the evidence in the light most favorable to the jury's verdict, disregarding all contrary evidence and inferences." *State v. Hendricks*, 619 S.W.3d 171, 173 n.1 (Mo. App. W.D. 2021).

China to stay with Elledge and Victim to assist in caring for their newborn daughter in accordance with Chinese tradition. Elledge became frustrated with the arrangement. Elledge and Victim had heated arguments and some of their arguments were recorded. On those recordings, Elledge can be heard making numerous angry and insulting statements toward Victim, her family, and Chinese culture, as well as bizarre comments filled with violent imagery.

In the summer of 2019, Elledge began seeking information about divorce. In early October of 2019, Elledge accessed an application on one of Victim's electronic devices and discovered intimate messaging between Victim and another man.

On October 8, 2019, Elledge killed Victim in the couple's apartment in Columbia, Missouri.[2] On October 9, 2019, Elledge loaded Victim's body into the trunk of Victim's car and drove around in central Missouri, stopping in Jefferson City, Missouri to buy a shovel. Later that evening, Elledge drove to numerous Missouri cities looking for a place to bury Victim. He drove toward Ashland, then to Guthrie, then to Fulton, then to

---

[2] Elledge's burial of Victim's body in a remote area prevented examiners from determining Victim's cause of death. Elledge testified that he and Victim had a physical altercation during which Elledge twice pushed Victim after Victim had first pushed Elledge. According to Elledge, he pushed Victim "very hard" into the kitchen counter. He then pushed Victim again "probably even harder" and that Victim's head hit with a "big thud" that he could feel. Elledge testified that Victim then asked Elledge to leave, and that he left for a half an hour. Elledge testified that he did not have any interaction with Victim after he returned home, and that he noticed that Victim was dead around 5:00 a.m. the next morning. The jury was free to disbelieve any part of Elledge's testimony. *See State v. Freeman*, 269 S.W.3d 422, 425 (Mo. banc 2008) ("[T]he fact-finder may believe all, some, or none of the testimony of a witness when considered with the facts, circumstances and other testimony in the case.").

Rocheport, then to Chouteau Springs, then returned to Columbia. On October 10, 2019, Elledge drove to a state park in Columbia and buried Victim's body.

Around this time, Elledge sought to conceal how Victim had died and concocted a lie that Victim had disappeared. Elledge presented this lie to the police in filing a missing persons report. Elledge conveyed this lie to Victim's friends and family, as well as his own friends and family. Elledge lied to the public at large through an interview with a media outlet.

In March of 2021, a hiker found Victim's skeletal remains where they had been buried in a state park. Victim's skeletal remains were missing several bones and teeth. Four of the ribs were fractured from a massive impact. By the time Victim's remains were discovered, they contained no soft tissue aside from a small amount of brain tissue. A pathologist who performed an autopsy determined that Victim's death was a homicide, meaning that another person caused Victim's death. The pathologist was unable to determine a cause of death.

Elledge was charged with first-degree murder for the death of Victim. The jury convicted Elledge of second-degree murder, finding beyond a reasonable doubt: (1) "that on or about October 8, 2019, in the State of Missouri, [Elledge] caused the death of [Victim]"; (2) "that [Elledge] knew or was aware that his conduct was causing or was

practically certain to cause the death of [Victim]"; and (3) "that [Elledge] did not do so under the influence of sudden passion arising from adequate cause[.]"[3]

Elledge now appeals to this court, challenging the sufficiency of the evidence to support the conviction for second-degree murder.

**Standard of Review**

"To determine whether the evidence presented was sufficient to support a conviction and to withstand a motion for judgment of acquittal, this Court does not weigh the evidence but, rather, accepts as true all evidence tending to prove guilt together with all reasonable inferences that support the verdict, and ignores all contrary evidence and inferences." *State v. Naylor*, 510 S.W.3d 855, 858-59 (Mo. banc 2017) (internal quotations and brackets omitted). Our review "is limited to determining whether there is sufficient evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt." *State v. Knox*, 604 S.W.3d 316, 319 (Mo. banc 2020) (quoting *State v. Porter*, 439 S.W.3d 208, 211 (Mo. banc 2014)). "This is not an assessment of whether this Court believes that the evidence at trial established guilt beyond a reasonable doubt but rather a question of whether, in light of the evidence most favorable to the State, any rational fact-finder 'could have found the essential elements of the crime beyond a reasonable doubt.'" *Naylor*, 510 S.W.3d at 859 (quoting *State v. Nash*, 339 S.W.3d 500, 509 (Mo. banc 2011)).

---

[3] The jury was also instructed on first-degree murder, voluntary manslaughter and involuntary manslaughter.

## Analysis

In his sole point on appeal, Elledge argues that the trial court erred in overruling Elledge's mid-trial and post-verdict motions for acquittal because the State's evidence was insufficient to support a submissible case of second-degree murder. Elledge contends that the State's evidence failed to establish that Elledge knowingly caused Victim's death because the evidence failed to establish the cause or manner of her death.

As an initial matter, Elledge has waived any claim that the trial court erred in overruling his motion for acquittal at the close of the State's evidence. After the trial court overruled that motion, Elledge presented evidence on his own behalf, thereby waiving any claim of error regarding the trial court's ruling on the motion for acquittal at the close of the State's evidence. *See State v. Carroll*, 41 S.W.3d 878, 883 (Mo. banc 2001) (citing *State v. Purlee*, 839 S.W.2d 584, 587 (Mo. banc 1992)). In such circumstances, an appellate court reviews whether sufficient evidence was presented to withstand the motion for judgment of acquittal at the close of all the evidence. *See id.*

As relevant here, a person commits the offense of second-degree murder if he or she: "Knowingly causes the death of another person or, with the purpose of causing serious physical injury to another person, causes the death of another person[.]" § 565.021.1(1).[4] In finding Elledge guilty of second-degree murder, the jury found that Elledge caused the death of Victim; that Elledge "knew or was aware that his conduct

---

[4] Unless otherwise indicated, statutory references are to RSMo 2016.

was causing or was practically certain to cause the death of [Victim]"; and that Elledge "did not do so under the influence of sudden passion arising from adequate cause[.]"

In this matter, the evidence supported the jury's finding that Elledge caused Victim's death. A pathologist testified that Victim's death was caused by another person. Based on the evidence in the record, the jury could certainly find that Elledge was that person. In his own testimony, Elledge acknowledged that he shoved Victim twice, that the second shove was "very hard," and that Victim's head made a "big thud" when it hit the floor. Elledge then attempted to conceal Victim's death by loading Victim's body into the trunk of her car and burying her body in a remote area while spreading lies about her "disappearance." The jury could find from such conduct that Elledge caused Victim's death.

Regarding whether Elledge knowingly caused the death of Victim, "[i]ntent is rarely susceptible to proof by direct evidence and is most often inferred circumstantially." *State v. Lammers*, 479 S.W.3d 624, 633 (Mo. banc 2016). "The necessary intent may be inferred from surrounding facts such as the defendant's conduct before the act, from the act itself, and from the defendant's subsequent conduct." *State v. Thompson*, 538 S.W.3d 390, 393 (Mo. App. W.D. 2018) (internal quotations omitted). In this matter, it was reasonable for the jury to infer that Elledge knowingly caused Victim's death based on the evidence in front of the jury. Elledge's behavior following Victim's death supports the jury's finding that he knowingly caused her death, particularly his extensive efforts to cover up Victim's death and how she died. *See State v. Ellison*, 980 S.W.2d 97, 101-02

6

(Mo. App. W.D. 1998) (jury could infer defendant's intent to kill or seriously injure from fact that defendant had killed, buried, and hidden victim, and had demonstrated a guilty mind in extensive efforts to cover up fact of victim's death); *see also State v. Franco*, 544 S.W.2d 533, 536 (Mo. banc 1976) (jury may reasonably infer from the concealment of a victim's body that the victim was killed intentionally under circumstances that were not justifiable or excusable).

Additionally, the jury heard several hours of audio recordings of arguments and conversations between Elledge and Victim, which provided additional evidentiary support for the jury's finding that Elledge knowingly caused Victim's death. During the course of these recordings, Elledge referred to himself as "a fucking god[,]" referred to Chinese families engaging in Chinese tradition as a "thousand worthless piece of shit families[,]" referred to Victim and her mother and father with numerous insults, and made threats regarding Victim's mother. Elledge further made bizarre comments filled with violent imagery such as that he "conquer[s] nature" by killing it, by "grab[bing] its head and break[ing] its fucking neck." Elledge further commented that Victim was "still just a woman and there's nature in that." The jury also heard Elledge tell Victim: "I think it's best you go back to China. It's obvious you Chinese not good here. You're not good with the best American, the best American."

Elledge argues that the State was unable to present any evidence as to the manner or cause of Victim's death. Regarding the manner of Victim's death, the jury heard testimony from a pathologist that her manner of death was determined to be a homicide

7

as opposed to a suicide, an accidental death, death by natural causes, or an undetermined death. Regarding the cause of Victim's death, the reason that medical experts were not able to determine a cause of death was because of Elledge's efforts in concealing Victim's death and his role in her death. The jury was free to draw reasonable inferences from Elledge's belligerent statements to Victim beforehand, from his own admissions regarding the violent confrontation with Victim, and from his behavior following her death. The jury did so in this case.

Elledge argues that convictions based on circumstantial evidence are subject to limits. Elledge cites to *State v. Grim* for the proposition that "[w]here the conviction rests on circumstantial evidence, the facts and circumstances to establish guilt must be consistent with each other, consistent with the guilt of the defendant, and inconsistent with any reasonable theory of his innocence." *State v. Grim*, 854 S.W.2d 403, 406 (Mo. banc 1993). This sentence, which Elledge quotes from *Grim*, was the *Grim* Court defining the circumstantial evidence rule as it had then existed. *See id.* The *Grim* Court then discarded the circumstantial evidence rule: "we reject the circumstantial evidence rule as a standard for reviewing the sufficiency of the evidence." *Id.* at 407; *see also State v. Nash*, 339 S.W.3d 500, 509 (Mo. banc 2011) (recognizing that "*Grim* abrogated the circumstantial evidence rule and rejected the use of the circumstantial evidence instruction"). Elledge's reliance on *Grim* is clearly misplaced, and his arguments based on the abrogated circumstantial evidence rule are rejected.

Elledge argues further that his testimony was the only evidence as to how Victim died. He argues that, following his testimony, the State failed to prove that Victim's death was not caused by sudden passion arising from adequate cause. The jury found that Elledge did not act under the influence of sudden passion arising from adequate cause. Elledge fails to recognize that the jury was free to disbelieve any part of his testimony. *See State v. Freeman*, 269 S.W.3d 422, 425 (Mo. banc 2008) ("[T]he fact-finder may believe all, some, or none of the testimony of a witness when considered with the facts, circumstances and other testimony in the case.").

Elledge makes further arguments regarding the State having failed to prove the *corpus delicti*. This argument is not contained in Elledge's point on appeal. Nevertheless, the Missouri Supreme Court has held that sufficiency claims may be considered on appeal even if not properly briefed. *See State v. Claycomb*, 470 S.W.3d 358, 361-62 (Mo. banc 2015). "The corpus delicti in a homicide case consists of two elements: (1) proof of the death of the victim and (2) evidence that the criminal agency of another was the cause of the victim's death." *State v. Howery*, 427 S.W.3d 236, 244 (Mo. App. E.D. 2014). In this matter, there is no question that Victim died. As discussed *supra*, the evidence was sufficient to establish that Elledge knowingly caused Victim's death. Accordingly, we reject Elledge's *corpus delicti* arguments.

Elledge makes further arguments that the evidence was insufficient because a finding that Elledge knowingly caused Victim's death requires impermissible "inference-stacking." We disagree. "[I]t is well-settled that any number of inferences may be drawn

9

in a given case provided each rests upon and reasonably arises from and out of facts and circumstances shown by the evidence." *State v. Kinsella*, 578 S.W.3d 802, 816 (Mo. App. E.D. 2019). "The proscription against inference-stacking does not extend to drawing several inferences from the same proven facts if each inference is supported by those facts." *Id.* The jury could reasonably infer that Elledge knowingly caused the death of Victim from the facts and circumstances shown by the evidence. *See Ellison*, 980 S.W.2d at 101-02; *see also Franco*, 544 S.W.2d at 536.

The evidence was sufficient to support Elledge's conviction.

## Conclusion

The judgment is affirmed.

_____
Thomas N. Chapman, Judge

All concur.